## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DIONNE SANTOS-MEANS, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 8804 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Manish S. Shah |
| SHERIFF'S OFFICE OF COOK COUNTY, | ) | |
| ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S LOCAL RULE 56.1
## STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT

Defendant, Sheriff's Office of Cook County, Illinois, by and through its attorney, ANITA ALVAREZ, State's Attorney of Cook County, by and through her assistant, Scot A. Golden, hereby submits its Local 56.1 statement of material facts[1] to which there is no genuine issue.

**PARTIES**

1.     Dionne Santos-Means ("Plaintiff") was hired by the Cook County Sheriff's Office ("Sheriff's Office") on July 26, 1993, as a Correctional Officer. (Exhibit 1, Plaintiff's Amended Complaint at Law, ¶ 4; Exhibit 2, Deposition of Plaintiff Dionne Santos Means, pp. 38:17-39:8, 45:18-21) On or about September 20, 2004, she was promoted to the rank of Correctional Sergeant, which is the rank she holds today. (Ex. 1, ¶ 4; Ex. 2, pp. 32:11-16, 37:18-23, 38:13-39:4; Exhibit 3, Personnel Action Form)

2.     The Cook County Department of Corrections ("Department of Corrections") is a division of the Sheriff's Office, which includes the Sheriff's Office's Boot Camp ("Boot

---

[1]     For purposes of this motion only, the statements made herein are taken as true. Defendant reserves the right to challenge Plaintiff's deposition statements and allegations in the amended complaint outside the context of its motion for summary judgment.

Camp"). (Ex. 1, ¶ 3; Exhibit 4, Boot Camp Drill Instructor/Correctional Officer and Drill Sergeant/Correctional Sergeant Job Descriptions) The Boot Camp is an alternative sentencing program for male, non-violent offenders between the ages of 17 and 35. (Ex. 2, pp. 51:13-24; Exhibit 5, Deposition of John Harrington, p. 11:16-18) Inmates incarcerated at the Boot Camp engaged in daily activities including attending classes and participating in a rigorous exercise program. (Ex. 2, p. 52:5-16) The Boot Camp, which is a 24-hour facility, houses approximately 225 inmates in 5 barracks. (Ex. 2, pp. 57:19-21, 58:11-13, 62: 12-15)

**PLAINTIFF'S EMPLOYMENT**

3.        On or about July 29, 1996, Plaintiff was assigned the position of Drill Instructor at the Boot Camp (Ex. 2, pp. 37:24-38:10; Ex. 5, p. 6:6-7). The position of Drill Instructor is equivalent in rank to the position of Correctional Officer. (Ex. 2, pp. 37:24-38:7; Ex. 4, p. 1)

4.        Sheriff's Office sworn staff assigned to the Boot Camp are comprised of Drill Instructors, Drill Sergeants, Drill Lieutenants, and at least one Captain who are assigned to one of 3 shifts. (Ex. 2, pp. 58:14-19, 62: 6-9, 66:1-7, 69:13-18, 107:22-24) Typically, 12-14 Drill Instructors, 2-4 Drill Sergeants, 2-3 Drill Lieutenants, and at least 1 Captain are assigned to each shift. (Ex. 2, pp. 62: 6-9, 66:1-7, 69:13-18, 107:22-24)

5.        Drill Instructors are responsible for the care and custody of inmates incarcerated at the Boot Camp. (Ex. 4, p. 1) Specifically, the duties and responsibilities of Drill Instructors include leading and supervising inmates in rigorous and demanding physical activity on a daily basis. (Ex. 2, pp. 52:1-53:3, 55:15-56:11; Ex. 4, p. 1) Drill Instructors also perform tasks including waking inmates up, ensuring inmates cleaned their barracks, escorting inmates to meals, escorting inmates to classes, marching with inmates, and responding to emergencies. (Ex. 2, pp. 52:18-53:3; Ex. 4, pp. 1-2)

6.      To maintain their position at the Boot Camp, Drill Instructors must take and pass a bi-annual physical fitness test consisting of a 1.5 mile run on the Boot Camp's outdoor track, push-ups, and sit-ups. (Ex. 2, pp. 193:61-94:10; Ex. 4, p. 2)

7.      Plaintiff took and passed the Sergeant's promotional examination. (Ex. 2, pp. 66:23-67:11). On or about September 20, 2004, Plaintiff was promoted to the position of Drill Sergeant, which was equivalent to the rank of Correctional Sergeant. (Ex. 2, pp. 38:8-15, 66:14-16)

8.      Plaintiff states she was promoted to the position of Drill Sergeant "[b]ased on my work ethic, passing the physical fitness every year – well, twice every year, coming to work, work hard like any other person that got promoted." (Ex. 2, p. 66:17-22)

9.      Drill Sergeants are front line supervisors responsible for the daily activities of both subordinate staff and inmates. (Ex. 2, pp. 73:23-74:7; Ex. 4, p. 4) A Drill Sergeant is responsible for supervising Drill Instructors' daily activities and ensuring they are properly training inmates how to march and how to exercise, ensuring that inmates attend school, shower, are fed, and participate in extracurricular activities. (Ex 2, pp. 68:21-70:17; Ex. 4, pp. 5-6) A Drill Sergeant's responsibilities also include exercising and marching with the inmates and Drill Instructors and working outside in extreme weather conditions. (Ex. 1, ¶ 10; Ex. 2, pp. 72:18-73:13, 79:10-80:12, 87:21-88:12) Additionally, Drill Sergeants are expected to assist in emergency situations such as an inmate attempting to escape, an emergency medical situation, or in the case of a fight between inmates. (Ex. 2, p. 82:4-12) Further, a Drill Sergeant might be required to assume the duties of a Drill Instructor in the case of a daily staff shortage. (Ex. 2, pp. 81:2-82:3)

10. Both Drill Instructors and Drill Sergeants have contact with inmates on a daily basis. (Ex. 2, pp. 52:1-53:3, 55:15-56:11, 84:21-85:1)

11. Like Drill Instructors, Drill Sergeants were required to take and pass a bi-annual physical fitness test consisting of a 1.5 mile run on the Boot Camp's outdoor track, push-up, and sit-ups to maintain their position at the Boot Camp. (Ex. 2, pp. 193:16-194:10; Ex. 4, pp. 5-6)

12. While a Drill Sergeant, Plaintiff was a member of the AFSCME union. (Ex. 2, p. 190:9-20)

**PLAINTIFF'S DIAGNOSES OF SARCOIDOSIS AND BRONCHIAL ASTHMA**

13. On or about September 16, 2008, Plaintiff's was diagnosed with the medical condition sarcoidosis after Plaintiff had experienced shortness of breath while completing Sheriff's Office in-service training at Maywood College. (Ex. 2, pp. 90:13-18, 91:2-20, 94:5-20, 95:16-17, 144:22-145:1-4; Exhibit 6, Deposition of Girma Assefa, M.D. pp. 59:9-61:8; Exhibit 7, Deposition of Agop Tepeli, M.D., pp. 25:3-7, 26:6-8) Plaintiff was subsequently diagnosed with bronchial asthma. (Ex. 2, pp. 152:20-153:11)

14. Sarcoidosis is a disease that affects multiple organs, the most dominant organ being the lung, which can cause the destruction of lung tissue that results in significant respiratory issues for patients. (Ex. 6, pp. 38:18-39:5; Ex. 7, p. 25:8-13) Sarcoidosis has no known cause. (Ex. 6, pp. 38:18-39:5; Ex. 7, p. 25:9-13)

**PLAINTIFF'S SMOKING COMPLAINT**

15. Plaintiff claims that in October of 2009 she was exposed to second-hand cigarette smoke when she entered and exited the Boot Camp through its main doors. (Ex. 1, ¶ 11; Ex. 2, pp. 106:12-19, 108:16-19, 110:5-19) Specifically, Plaintiff claims that she would encounter Boot Camp employees, approximately 2 at a time, smoking near the main front gatehouse or just

inside the doors 2-3 times per week. (Ex. 2, pp. 111:7-10, 113:22-114:1) As a result, Plaintiff

would enter and exit the Boot Camp quickly so as to have limited exposure to the smoke. (Ex. 2,

pp. 133:22-134:4)

16.     On November 18, 2009, Plaintiff complained to the City of Chicago Department

of Public Health that there was smoking near and in the main doors to the Boot Camp. (Exhibit

8, City of Chicago Department of Public Health Complaint; Ex. 2, p. 118:16-24; Ex. 5, pp. 37:1-

3, 44:10-20)

17.     Around the same time as her complaint to the City of Chicago Department of

Public Health, Plaintiff claims she informed individuals at roll call and individually that the

cigarette smoke at the front entranceway to the Boot Camp affected her medical condition and

that smoking should be 15 feet away from the building. (Ex. 2, pp. 106:3-108:19, 114:9-115:2)

Plaintiff also asked one of the Captains assigned to the Boot Camp to make an announcement

during daily roll call that there should be no smoking near the front entryway to the Boot Camp.

(Ex. 2, pp. 121:17-122:12) Plaintiff admits that such an announcement was made at the next roll

call following their conversation. (Ex. 2, pp. 121:17-122:12)

18.     One week after her complaint, Plaintiff informed John Harrington ("Harrington"),

the former Executive Director of the Boot Camp, that she had a lung disease and that the smoke

by the entryway was affecting her. (Ex. 2, pp. 119:14-120:12; Ex. 5, pp. 37:17-38:24) Plaintiff

was advised by Harrington that he would look into the matter. (Ex. 2, p. 120:13-15) Plaintiff had

no other discussions with Harrington concerning smoking at the Boot Camp. (Ex. 2, p. 121:14-

16)

19.     The City of Chicago Department of Public Health notified the Boot Camp of

Plaintiff's complaint on December 28, 2009. (Ex. 8; Ex. 5, pp. 36:12-38:24)

20.     Harrington directed the Cook County Department of Facilities Management to draw a line on the ground outside of the Boot Camp entranceway/exit indicating that smoking should only occur behind that line. (Ex. 5, p. 39:12-22) Harrington also posted laminated no smoking signs near the entranceway. (Ex. 5, pp. 39:24-40:12)

21.     On January 6, 2010, Harrington issued a memorandum to all Boot Camp staff designating a specific area, marked with a red line, in front of the Boot Camp as the only area in the Boot Camp compound where smoking is permitted (Ex. 2, p. 130:12-16; Ex. 5, p. 39:12-22; Exhibit 9, John Harrington January 6, 2010 Memorandum). The memorandum was read at five consecutive roll calls. (Ex. 9)

22.     After Harrington issued the memorandum, Plaintiff did not encounter anyone smoking in the area she complained of when she entered the Boot Camp. (Ex. 2, pp. 131:22-133:3)

**PLAINTIFF'S 2010 LEAVE OF ABSENCE**

23.     On December 31, 2009, Plaintiff filed a grievance through her union complaining, in part, that she had been required to take a bi-annual fitness test in her position as a Correctional Sergeant without compensation. (Ex. 2, pp. 190:9-192:19; Exhibit 10, December 31, 2009 Grievance)

24.     Plaintiff's grievance proceeded to arbitration, and on February 21, 2011, the arbitrator determined that the Sheriff's Office could require Correctional Sergeants to take and pass a physical fitness test in order to maintain their employment as Drill Sergeants at the Boot Camp. (Exhibit 11, February 21, 2011 Arbitration Award, pp. 6, 9; Ex. 2, pp. 190:9-192:19) The arbitrator held that that employees assigned to the Boot Camp needed to be in good physical

shape due to the military disciplinary approach employed at the Boot Camp, which is what the fitness test measured. (Ex. 11, p. 6)

25.    Plaintiff admits that taking a bi-annual fitness test was a requirement of being assigned to the Boot Camp and had been a requirement since Plaintiff had first become a Drill Instructor in 1996. (Ex. 2, pp. 193:19-194:10; Ex. 4; Ex. 11, p. 3)

26.    On November 1, 2010, Plaintiff delivered a letter to Harrington from her primary care physician, Dr. Assefa, indicating that due to Plaintiff's medical condition, she should be permitted to perform the bi-annual physical fitness test indoors. (Exhibit 12, Dr. Assefa's November 1, 2010 Letter; Ex. 2, pp. 207:19-209:8) Harrington did not reject Plaintiff's request to take the bi-annual fitness test indoors and advised her he would look into the matter. (Ex. 2, p. 209:2-14) Only the Sheriff's Office Personnel Office, and not Harrington, had the authority to grant a request for accommodation. (Exhibit 13, Sheriff's Office ADA Accommodation Procedure; Ex. 5, p. 26:3-18)

27.    Harrington investigated whether it would be feasible to permit Plaintiff to take the fitness test indoors. (Ex.3, 79:23-80:6)

28.    Rosemarie Nolan ("Nolan"), the then-Director of Personnel for the Sheriff's Office, was then advised of Dr. Assefa's November 1, 2010 letter.  (Ex. 12; Ex. 5, pp. 73:17-74:10; Exhibit 14, Deposition of Rosemarie Nolan, p. 62:2-14)

29.    In response, on November 8, 2010, Nolan advised Plaintiff via letter to "report to the Cook County Medical Unit with a comprehensive diagnostic medical statement from your physician, identifying your restrictions no later than Monday, November 22, 2010. (Exhibit 15, Nolan's November 8, 2010 Letter; Ex. 2, pp. 211:15-212:11) Plaintiff admits that this letter was not a rejection of Plaintiff's request to take the fitness test indoors. (Ex. 12; Ex. 2, p. 212:15-17)

7

30. Plaintiff never reported to the Cook County Medical Unit ("CMU") and instead, on November 17, 2010, Plaintiff advised Nolan that Plaintiff's medical condition had worsened, she could no longer work, and she would need to be absent from work for an extended period of time. (Exhibit 16, Nolan's November 17, 2010 Letter; Ex. 2, pp. 213:16-214:15) Nolan confirmed this conversation in a letter to Plaintiff dated November 17, 2010, which also advised Plaintiff to contact the Cook County Pension Board to determine Plaintiff's eligibility for Ordinary Disability, confirmed Plaintiff's stated intention to update her Family and Medical Leave Absence status, and described the return to work process. (Ex. 16; Ex. 2, p. 215:2-16)

31. Plaintiff then elected to take FMLA and then Ordinary Disability leave from the Sheriff's Office. (Ex. 1, ¶ 20; Ex. 2, pp. 213:14-216:2; Exhibit 17, 2010 FMLA Documentation)

**PLAINTIFF'S 2011 RESTRICTIONS**

32. In a July 14, 2011 letter sent on Plaintiff's behalf to the Sheriff's Office, Dr. Tepeli advised that Plaintiff had been under his care and had been off of work since November 11, 2010, due to an exacerbation of her symptoms. (Exhibit 18, Dr. Tepeli July 14, 2011 Letter; Ex. 7, pp. 96:19-97:17) The letter further advised that Plaintiff could return to work on August 8, 2011, with specific restrictions, which were: (1) avoid cigarette smoke, dust, fumes, chemical sprays; (2) avoid exposure/running on recycled tire track; (3) avoid contact with inmates with tuberculosis or other airborne diseases; and (4) avoid extreme temperatures. (Ex. 18; Ex. 7, pp. 96:19-103:18) Plaintiff's physician had advised her that airborne diseases meant, "anything that could be transmitted through the air, cough, sneeze." (Ex. 2, pp. 155:13-156:3; Ex. 7, pp. 99:13-24)

33. Dr. Tepeli warned that the restrictions he listed for Plaintiff must be adhered or Plaintiff's "illness will be affected. Her asthma and sarcoidosis will be exacerbated. This could

lead to hospitalization and/or death. She is covered under the Americans with Disabilities Act due to this life long respiratory illness." (Ex. 18; Ex. 7, pp. 97:11-103:18)

34.    Dr. Tepeli included the above language because Plaintiff's life could indeed be at risk if the restrictions he indicated were not adhered to. (Ex. 7, p. 102:17-24)

35.    Dr. Tepeli only stated that Plaintiff was covered by the Americans with Disabilities Act because Plaintiff suggested that he include such language. (Ex. 7, p. 103:1-12)

36.    Even though the restrictions specified that Plaintiff should be permitted to perform the required physical fitness test indoors, Plaintiff was actually seeking to be exempted from the physical fitness test altogether. (Ex. 2, pp. 223:11-224:5)

37.    When a Sheriff's Office employee seeks to return to work with restrictions following a leave of absence, the employee is required to the following: submit a written request for accommodation to the Director of Personnel or her designee and provide the CMU with comprehensive diagnostic medical documentation from her doctor, specifying her diagnosis and whether her disability is permanent or temporary and covered by the ADA. (Ex. 13, p. 3) The CMU then provides the employee with a Physician's Approval Return to Work Form which the employee provides to the Director of Personnel or her designee. (Ex. 13, p. 4) The Director of Personnel or her designee then determines whether the employee can perform the essential functions of her current position. (Ex. 13, p. 4) If it is determined that an employee cannot perform the essential functions of her current position, the Director of Personnel or her designee identifies vacancies or other positions/classifications. (Ex. 13, p. 4) Alternate positions may require changes in title, shift, work location, merit status, and/or salary. (Ex. 13, p. 4) Employees who wish to appeal the Director of Personnel or her designee's decision can complete an appeal

form which is submitted to the Sheriff's Office's General Counsel or his designee for final
determination. (Ex. 13, p. 6)

38.     On August 5, 2011, after reporting to the CMU, Plaintiff met with Finola A.
Keegan ("Keegan"), the Sheriff's Office's Deputy Director of Personnel, to discuss her return to
work and restrictions. (Exhibit 19, Keegan August 5, 2011 Letter; Ex. 2, pp.239:18-241:5) At
that time, Plaintiff was advised that she may not be able to return to her position as a
Correctional Sergeant due to her restrictions. (Ex. 19) Plaintiff was advised that she might be
able to assume a civilian position that could accommodate her restrictions. (Ex. 19) Plaintiff was
further instructed to provide further clarification as to one of her restrictions to CMU and then
report back to the Sheriff's Office's Personnel Office. (Ex. 19)

39.     As the Director of Personnel, Nolan was responsible for handling accommodation
requests and ultimately responsible for determining whether a request for an accommodation
could be granted. (Ex. 14, pp. 29:7-31:12; Ex. 13, p. 4)

40.     Subsequent to meeting with Keegan, Plaintiff met with Nolan and Nolan advised
Plaintiff that, due to her restrictions, she is unable to perform the essential functions of a Drill
Sergeant or a Correction Sergeant. (Exhibit 20, Nolan August 18, 2011 Letter; Ex. 14, pp.
105:16-107:7, 108:1-9, 109:8-22; Ex. 2, pp. 218:19-220:4, 221:20-222:14, 224:7-22)

41.     Specifically, the Sheriff's Office could not accommodate Plaintiff's restriction
that she must avoid contact with inmates with tuberculosis or other airborne diseases, as such
effectively prohibited her from being in a setting where she might have contact with inmates who
potentially had an airborne illness. (Ex. 14, pp. 105:16-107:7; Ex. 7, pp. 97:11-103:18; Ex. 2, pp.
155:13-156:13)

42.     Even though Plaintiff's restrictions rendered her unable to perform the essential functions of a Drill Sergeant and a Correctional Sergeant, Nolan identified ADA-designated Correctional Officer positions Plaintiff could work in with her restrictions. (Ex. 14, pp. 112:13-22, 113:9-16) The ADA-designated assignments were in interlocks within the Department Of Corrections compound. (Ex. 14, pp. 112:13-22, 113:9-16) Interlock positions were ADA-designated positions because Correctional Officers assigned to interlock positions were locked in an enclosed room and had no direct contact with detainees and limited contact with anyone else. (Ex. 14, pp. 112:13-22, 113:9-16, 114:12-21)

43.     Interlock positions were for Correctional Officers and not Correctional Sergeants which would have required Plaintiff accepting a change in rank. (Ex. 14, pp. 107:3-7, 116:17-117:10) Plaintiff was presented with the choice to accept a Correctional Officer interlock position but she declined. (Ex. 14, pp. 106:18-107:7; Ex. 2, p. 224:10-18)

44.     Plaintiff was also presented with the choice to accept a civilian position within certain areas. (Ex. 14, p. 118:6-16; Ex. 2, p. 224:19-22)

45.     Confirmed via letter on August 18, 2011, Nolan explained to Plaintiff that Plaintiff's restrictions could not be accommodated as Plaintiff could not perform the essential functions of a Drill Sergeant or a Correctional Sergeant (Ex. 20; Ex. 14, pp. 104:20-105:11; Ex. 2, p. 236:5-237:8) Nolan also advised Plaintiff of the possibilities that she could continue to work in either a Correctional Officer interlock position or as civilian staff. (Ex. 20; Ex. 14, p. 107:3-7)

46.     Plaintiff declined to accept a Correctional Officer interlock position or a position as civilian staff and, instead, Plaintiff continued on disability leave. (Ex. 2, 237:10-15, 239:14-17) Plaintiff claims she could have been assigned to Correctional Sergeant/Drill Sergeant

11

positions at the Training Academy, the records department, or the Boot Camp. (Ex. 2, p. 22:15-23)

**PLAINTIFF'S 2012 RETURN TO WORK**

47.     On or about August 3, 2012, Plaintiff again reported to the CMU with amended work restrictions: (1) avoid cigarette smoke, dust, fumes and chemical spray; (2) be permitted to wear a protective mask in case of contact with inmates with tuberculosis or other airborne disease; and (3) avoid extreme temperatures (Ex. 2, pp. 249:7-9, 252:19-254:9; Exhibit 21, August 3, 2012 CMU Physicians Approval to Return to Work Form) These restrictions differed from the restrictions indicated by Dr. Tepeli one year earlier in that instead of avoiding contact with inmates with tuberculosis and other airborne diseases, the Sheriff's Office was now asked to simply permit plaintiff to wear a mask. (Ex. 2, p. 253:9-254:9; Ex. 7, p. 108:6-16)

48.     In a letter dated that same day to Nolan, Plaintiff's union requested on Plaintiff's behalf that Plaintiff be permitted to return to work as a Correctional Sergeant and assigned a position that would accommodate her amended restrictions. (Exhibit 22, August 3, 2012 Union Letter; Ex. 14, pp. 201:6-202:17) The union specifically stated that the air quality at the Cook County Jail and at the Boot Camp would exacerbate Plaintiff's condition and requested Plaintiff be assigned to other areas of the Sheriff's Office such as the Pre-Release Center. (Ex. 22; Ex. 14, pp. 201:6-204:1)

49.     In response, Nolan then identified a Correctional Sergeant position for Plaintiff at the Pre-Release Center that would accommodate Plaintiff's restrictions and notified Plaintiff of such. (Ex 2, pp. 257:11-258:4; Ex. 14, p. 202:6-17) Plaintiff spoke with Nolan about the position and Plaintiff accepted the position. (Ex 2, pp. 257:11-258:4)

50.     Plaintiff worked in this position at the Pre-Release Center for three days from August 17, 2012, to August 19, 2012. (Ex. 2, pp. 162:16-18, 261:7-10) After her shift on August 19, 2012, Plaintiff went to the hospital where she was diagnosed with pneumonia. (Ex. 2, p. 264:7-13; Ex. 7, p. 57:18-23)

51.     Plaintiff's physician could not determine the cause of the pneumonia. (Ex. 7, pp. 60:12-20)

52.     After working for 3 days at the Pre-Release Center, Plaintiff failed to return to work or submit for FMLA or Ordinary Disability because she did not have any ordinary disability time left and also did not have the ability to exercise FMLA. (Ex. 2, pp. 272:13-17, 275:15-22) Plaintiff's leave was thus unauthorized. (Ex. 2, p. 275:15-22; Exhibit 23, September 25, 2012 Department Of Corrections Memorandum; Exhibit 24, December 6, 2013 Sheriff's Office Personnel Office Memorandum)

**PLAINTIFF'S 2013 RETURN TO WORK**

53.     Plaintiff returned to work in 2013 after she was cleared to return to work by her physician. (Ex. 2, p. 276:3-20) Plaintiff discussed her return to work with Nolan and it was determined that Plaintiff's then-restrictions could be accommodated by assigning Plaintiff to the Sheriff's Office's Visitation Center. (Ex. 2, pp. 276:7-277:19) Plaintiff's claims of discrimination and retaliation in this case do not relate to her assignment to the Visitation Center. (Ex. 2, pp. 278:5-279:6)

**PLAINTIFF'S EEOC COMPLAINTS**

54.     On or about January 24, 2012, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights, alleging that Plaintiff was a Correctional Sergeant who had requested a reasonable accommodation for a disability that was not provided. (Ex. 1, Exhibit

A) Plaintiff further stated that she was asked to take a demotion. (Ex. 1, Exhibit A) On August 6, 2012, the United States Equal Employment Opportunity Commission ("EEOC") issued a Notice of Suit Rights, indicating that the EEOC issued no finding with regard to Plaintiff's claims. (Ex. 1, Exhibit B)

55.     On or about April 11, 2013, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights, alleging that Plaintiff was a Correctional Sergeant who had requested a reasonable accommodation for a disability that was not provided. (Ex. 1, Exhibit C) Plaintiff further stated that she was placed on unauthorized duty absence. (Ex. 1, Exhibit C) On April 16, 2013, the EEOC issued a Notice of Suit Rights, indicating that the EEOC issued no finding with regard to Plaintiff's claims. (Ex. 1, Exhibit D)

**PLAINTIFF'S WORKER'S COMPENSATION CLAIMS**

56.     Plaintiff alleges that the conditions at the Pre-Release Center caused her to contract pneumonia and exacerbated her conditions of sarcoidosis and asthma. (Ex. 2, p. 266:6-267:3) On that basis, Plaintiff filed a worker's compensation claim. (Ex. 2, p. 266:6-267:3)

57.     Plaintiff's worker's compensation claim, based on the 3 days she worked at the Pre-Release Center, was denied by the Cook County Department of Risk Management and not the Sheriff's Office. (Ex. 2, p. 274:24-275:3; Ex. 23; Exhibit 25, Authorization for Release of Medical Records/Employment Information; Exhibit 26, September 25, 2012 Cook County Department of Risk Management Letter)

> Respectfully submitted,
> ANITA ALVAREZ
> State's Attorney of Cook County
> By:    /s/ *Scott A. Golden*
> Scott A. Golden, ASA
> 500 Richard J. Daley Center
> Chicago, IL 60602
> (312) 520-0102

14