Dionne Santos-Means v. Sheriff's Office of Cook County, Illinois

12 C 8804

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 2

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIONNE SANTOS-MEANS,              )
                                  )
              Plaintiff,          )
                                  )
         vs.                      ) No. 12 C 8804
                                  )
SHERIFF'S OFFICE OF               )
COOK COUNTY,                      )
                                  )
              Defendant.          )

         The deposition of DIONNE P. SANTOS-MEANS,
called by the Defendant for examination, taken pursuant
to notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Teresa Resendez, Certified Shorthand Reporter, at
500 Richard J. Daley Center, Chicago, Illinois,
commencing at 10:16 a.m. on July 24th, 2015.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 2

1    APPEARANCES:

2

3        TOWNSEL LAW FIRM
         MR. ANDRE E. TOWNSEL
         715 East Golf Road
4        Suite 205
         Schaumburg, Illinois 60173
5        Phone:  312.772.5850
         E-mail: atownsel@townsellaw.com
6
             On behalf of the Plaintiff;
7

8        ASSISTANT STATE'S ATTORNEY
         MR. SCOTT A. GOLDEN
9        500 Richard J. Daley Center
         Chicago, Illinois 60602
10       Phone:  312.603.1902
         E-mail: scott.golden@cookcountyil.gov
11
             On behalf of the Defendant.
12

     ALSO PRESENT:  Mr. Joe Beile
13
                     Video Instanter
14

15                   Mr. John Koechley

16                   Assistant State's Attorney Law Clerk

17

18                   *    *    *    *    *    *

19

20

21

22

23

24

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 32

1       MR. TOWNSEL:  Overbroad.

2           Please answer.

3   BY THE WITNESS:

4       **A.**   No, I can't at this time, sir.

5       **Q.**   Okay.  I do want to discuss -- This sort of

6   brings us into discussing your employment history.

7   However, before we get to that, I want to see if you

8   took any other post high school classes or coursework

9   other than what we've talked about.

10      **A.**   Not that I can recall at this time.

11      **Q.**   Okay.  If we can then move into your

12  employment history, you're currently employed with the

13  Cook County Sheriff's Office; is that correct?

14      **A.**   Yes, sir.

15      **Q.**   And what is your current position?

16      **A.**   I'm a correctional sergeant.

17      **Q.**   And where are you assigned?

18      **A.**   FTO program.

19      **Q.**   What does that mean?

20      **A.**   Field training officers program.

21      **Q.**   And how long have you been in that

22  assignment?

23      **A.**   Approximately nine months.

24      **Q.**   And where are you located in that role?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 37

1   assignment before the visitation center?

2        A.   At the boot camp.

3        Q.   Okay.  It was not at the pre-release center?

4        A.   Oh, I'm sorry.  It was the pre-release

5   center.

6        Q.   Okay.  That was your immediate assignment

7   prior to the visitation center?

8        A.   That's correct, sir.

9        Q.   Okay.  And you were also a correctional

10  sergeant at the pre-release center?

11       A.   That's correct, sir.

12       Q.   Okay.  And you were there for a very short

13  period of time; is that right?

14       A.   Three days.

15       Q.   Okay.  And prior to that, you were at the

16  boot camp?

17       A.   That's correct, sir.

18       Q.   And you were a correctional sergeant --

19  excuse me -- a drill sergeant with the boot camp?

20       A.   That's correct, sir.

21       Q.   And how long were you a drill sergeant at the

22  boot camp?

23       A.   Promoted to drill sergeant in 2004.

24       Q.   Were you with the boot camp prior to 2004?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 38

1      **A.**    Yes, sir.

2      **Q.**    Okay.  And would that have been in the

3    position of drill instructor?

4      **A.**    That's correct.

5      **Q.**    Is that equivalent to the position of

6    correctional officer?

7      **A.**    That's correct, sir.

8      **Q.**    Okay.  And how long were you a drill

9    instructor at the boot camp?

10     **A.**    From 1996 to 2004, September of 2004.

11     **Q.**    When you were promoted to drill sergeant?

12     **A.**    That's correct.

13     **Q.**    And for clarity, drill sergeant is the

14   equivalent to correctional sergeant --

15     **A.**    That's correct.

16     **Q.**    -- is that about right?

17           Prior to joining the boot camp, did you hold

18   any positions with the Cook County Sheriff's Office?

19     **A.**    I worked in Division 5 as a correctional

20   officer.

21     **Q.**    You said as a correctional officer?

22     **A.**    Yes, sir.

23     **Q.**    Okay.  And how long were you a correctional

24   officer in Division 5?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 39

1      **A.**    Approximately two and a half years.

2      **Q.**    And does that bring us to the beginning of

3   your employment with the Sheriff's Office?

4      **A.**    That's correct.

5      **Q.**    Okay.  So your first assignment with the

6   Sheriff's Office, once you joined the Sheriff's Office,

7   was Division 5 correctional officer?

8      **A.**    That's correct.

9      **Q.**    Okay.  And what were your general duties and

10  responsibilities as a correctional officer in

11  Division 5?

12     **A.**    Do 30-minute checks, to feed, to get courts

13  ready.  That was during the midnight shift.

14          And during the day shift, pretty much courts

15  and visits.

16     **Q.**    You mentioned different shifts.  There are

17  different shifts -- shift assignments at the jail?

18     **A.**    Yes, sir.

19     **Q.**    Okay.  When you were a correctional officer

20  in Division 5, did you work a specific shift or did you

21  rotate?

22     **A.**    I worked nights, 11:00 to 7:00.

23     **Q.**    During the entire two and a half years that

24  you were there?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 45

1      Q.   Anything else you remember about that job?

2      A.   No, sir.

3      Q.   And why did you leave Courtesy Home Center?

4      A.   Courtesy was a part-time job that I had

5   during high school.  And I was offered the position

6   with Harris Bank.  So I pursued that for a full-time

7   career.

8      Q.   Okay.  My apologies.  Anything else to add?

9   I felt like I cut you off there.  Anything else?

10      A.   No, sir.

11      Q.   So you worked at Courtesy Home Center while

12   you were in high school?

13      A.   That's correct, sir.

14      Q.   Okay.  Have you held any other employment

15   other than what we've discussed here today?

16      A.   Other than working at a candy store during

17   eighth grade, not that I can recall.

18      Q.   Okay.  While you were with the Sheriff's

19   Office -- And I believe that was from 1993 to the

20   present.  Is that right?

21      A.   Yes, sir.

22      Q.   (Continuing.) -- have you ever held secondary

23   employment?

24      A.   No, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 51

1    Q.   Okay.

2         (Continuing.) -- and asthma while you were a

3    drill sergeant at the Cook County Sheriff's Office boot

4    camp?

5    A.   That's correct, sir.

6    Q.   Okay.  When did you begin at the boot camp?

7    I believe it was -- Prior to 2004, I know that that's

8    when you became a sergeant at the boot camp.  But

9    remind me when you began there.

10   A.   July 1996.

11   Q.   And that was as a drill instructor, correct?

12   A.   Yes, sir.

13   Q.   Okay.  And can you tell me, what did you do

14   as a -- First of all, what is the boot camp?

15   A.   The boot camp was an alternative program for,

16   quote/unquote, nonviolent offenders to try to get them

17   back into society by means of discipline and education.

18   Q.   Okay.  And was -- Who was eligible to be in

19   the boot camp as an inmate?

20   MR. TOWNSEL:  Objection:  lack of foundation.

21        Please answer if you know.

22   BY THE WITNESS:

23   A.   I believe the criteria was 17 through 35,

24   nonviolent offenders, first-time offenders.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 52

1    Q.   And so was this a program for individuals who

2    had already been convicted of a crime, to your

3    knowledge?

4    A.   Yes, sir.  To my knowledge, yes.

5    Q.   Okay.  And was the boot camp different from

6    being a detainee in the Department of Corrections?

7    A.   Yes, it was.

8    Q.   Okay.  How so?

9    A.   The structure of the program, it was -- it

10   was full of daily activities.  It wasn't like the jail

11   where inmates just sat, came out for a period of time,

12   and then locked back up.  The inmates in the boot camp

13   were required to go to class, drug abuse classes,

14   exercise, work.  So they had activities that they had

15   to participate in in order to be a part of that

16   program.

17   Q.   Okay.  And as a correctional -- Excuse me.

18        As a drill instructor, what would you do on a

19   daily basis?

20   A.   Daily basis consisted of -- Every other day,

21   we would exercise, wake them up, have them clean their

22   assigned barracks, take them to breakfast, bring them

23   back, give them showers, prepare them for school -- if

24   they didn't have school, then they would have drug

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 53

1   classes -- march, take them outside, teach them how to

2   do marching movements.  Sometimes they had physical

3   fitness competitions.  And that was the day.

4       Q.   Okay.  And we talked about, earlier, that as

5   a drill instructor, that's equivalent to correctional

6   officer?

7       A.   Yes, sir.

8       Q.   Okay.  Do you know why the boot camp

9   correctional officers were referred to as drill

10  instructors?

11      MR. TOWNSEL:  Objection:  lack of foundation.

12          Please answer if you know.

13  BY THE WITNESS:

14      A.   Can you repeat that question?

15      Q.   Do you know why correctional officers were

16  referred to as drill instructors in the boot camp?

17      A.   We were trained by the military to become

18  drill instructors.

19      Q.   Okay.  Good segue.  Why don't you talk to me

20  about what sort of training, if any, you had to become

21  a drill instructor.

22      A.   In 1996, once we moved over to the facility

23  located at 2801 Rockwell, the boot camp facility, the

24  military came to Chicago to the boot camp facility and

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 55

1      Q.    Okay.  And what -- As part of your training,

2  you mentioned a physical component; is that accurate?

3      A.    That's correct, sir.

4      Q.    Okay.  Can you describe that physical

5  component?

6      A.    The physical component was being able to take

7  a group of individuals and teach them how to properly

8  exercise.

9      Q.    Okay.  And what do you mean by "properly

10  exercise"?

11      A.    How not to injure your muscles, how to

12  perform the exercise correctly so that you can get the

13  best benefit from the exercise.  That was pretty much

14  it.

15      Q.    What types of exercise did you do as part of

16  your training?

17      A.    Side straddle hops; mountain climbers; the

18  lungers; we ran; high jumper; different stretches for

19  the calf muscles; the overhead arm pulls; chest

20  stretch; neck and shoulder stretch; lower body

21  stretches; so just stretches designed to prepare you

22  for the exercise that you will do.

23      Q.    Okay.  And is it fair to say that the

24  exercises were strenuous?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 56

1      A.    I wouldn't necessarily say "strenuous," but

2  it depends on the individual.

3      Q.    Okay.  And you're describing your training

4  right now.  But are those the type of exercises that --

5  once you became a drill instructor, that you would do

6  with the inmates that were under your charge?

7      A.    That's correct, sir.

8      Q.    Okay.  And did you exercise with -- When you

9  were a drill instructor, did you exercise with inmates

10 on a daily basis?

11     A.    Every other day.

12     Q.    Every other day?  Okay.

13           And would you do the same exercises every

14 other day?

15     A.    Pretty much, yes.

16     Q.    Okay.  And were those the exercises you just

17 described?

18     A.    Yes, sir.

19     Q.    Okay.  And how much time was spent each day

20 on exercising when you did exercise?

21     A.    Approximately an hour.

22     Q.    Okay.  When you say -- When I say "exercise"

23 or when you say "exercise," are you including marching?

24 You mentioned marching before.  Or is that separate?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 57

1      A.    That was separate.

2      Q.    Okay.  And what do you mean by "marching"?

3      A.    Marching consisted of teaching an inmate how

4  to march forward in a group, do columns, turn left,

5  execute a left turn as a group, a right turn as a

6  group, to go in a direction and come back as a group,

7  which is a camel column, forward column, left column,

8  right, forward march, basic marching.

9      Q.    Okay.  And would you march on a -- As a drill

10  instructor, would you march on a daily basis with the

11  inmates that were under your charge?

12      A.    Yes, sir.  From Point A to Point B is how

13  they -- They marched to get from Point A to Point B.

14      Q.    Okay.  So you would march throughout the day?

15      A.    Yes, sir.

16      Q.    Okay.  And how many -- If you know, how many

17  inmates at any given time were assigned to the boot

18  camp?

19      A.    Approximately 225, 48 per barracks.

20  Normally, there were, like, 48 per barracks.  And we

21  had about five -- five barracks.  So maybe 200, 220.

22      Q.    Okay.  And barracks would be where the

23  inmates sleep?

24      A.    Yes, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 58

1      Q.   Okay.  And would you refer to them as

2   "inmates" versus "detainees"?

3      A.   I used both.

4      Q.   You used both.  Okay.

5           Interchangeably?

6      A.   Yes, sir.

7      Q.   Okay.  So when we say "inmates" or

8   "detainees" here in the deposition, can we agree that

9   we mean the same thing?

10     A.   Yes, sir.

11     Q.   Okay.  And obviously the boot camp was a

12  24-hour facility?

13     A.   Yes, sir.

14     Q.   How many shifts were there?

15     A.   There were three shifts.

16     Q.   What were those shifts, if you recall?

17     A.   5:00 to 1:00 -- I'm sorry.  5:00 a.m. to

18  1:00 p.m., 1:00 p.m. to 9:00 p.m., and 9:00 p.m. to

19  5:00 in the morning.

20     Q.   Okay.  And as a drill instructor, what shift

21  were you assigned to?

22     A.   I worked the 5:30-to-1:30 shift.

23     Q.   That's 5:30 a.m. to 1:30 p.m.?

24     A.   Yes, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 62

1    Q.   Okay.  Any other incident involving an

2  attempted escape that you can recall when you were

3  there as a drill instructor?

4    A.   No.  I know there had been some escapes, but

5  I don't recall during that time frame when it happened.

6    Q.   Okay.  And how many drill instructors are

7  assigned each shift to the boot camp during the time

8  that you were a drill instructor?

9    A.   Approximately 12, 14.

10   Q.   Would that be for all three shifts?

11   A.   That's pretty much so.

12   Q.   Okay.  And was the boot camp filled to

13  capacity with about 48 inmates per barrack and about

14  five barracks?

15   A.   Yes.

16   Q.   Would that be during your entire tenure

17  there?

18   A.   No, sir.  There were times when we wouldn't

19  get a full 48 inmates.  Sometimes we would get less,

20  but no more than 48.

21   Q.   Okay.  When you would -- Do you recall when

22  you would -- how often you would get less than 48?

23   A.   I don't recall how often.

24   Q.   Okay.

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 66

1      Q.   Okay.  And how many drill sergeants were
2    assigned per shift?
3      A.   Two to three.
4      Q.   And was that level of staffing for drill
5    sergeants consistent throughout your time at the boot
6    camp?
7      A.   Yes.
8      Q.   Okay.  And when I ask about staffing levels,
9    I mean both as your time as a drill instructor and as a
10   drill sergeant.
11     A.   Okay.
12     Q.   Does your answer remain the same?
13     A.   Yes, sir.
14     Q.   Okay.  And you said, in 2004, you were
15   promoted to drill sergeant, correct?
16     A.   Yes, sir.
17     Q.   And how did you come to be promoted to drill
18   sergeant?
19     A.   Based on my work ethic, passing the physical
20   fitness every year -- well, twice every year, coming to
21   work, work hard like any other person that got
22   promoted.
23     Q.   Did you apply for a position?
24     A.   I took the sergeant's exam.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 67

1    Q.   How does that work?

2    A.   I believe, every two years, there's an

3   announcement that goes forward that the Sheriff will be

4   testing for promotions, sergeants, lieutenants.  And

5   you go take the test.

6    Q.   Okay.  And what happens after you take the

7   test?

8    A.   You're put on a list with anyone else who

9   have qualified or passed the test, and hopefully you

10  hear the announcement that you're going to get

11  promoted.

12   Q.   Okay.  And you were, and you remained with

13  the boot camp, correct?

14   A.   That's correct.

15   Q.   What shift were you assigned?

16   A.   2004, I don't remember, sir.

17   Q.   Okay.  Would that suggest that your shift

18  changed over the course of your time as a drill

19  sergeant with the boot camp?

20   A.   Yes.  I may have started out on nights and,

21  when a day position became available, bid into the day

22  shift or the afternoon.  I do recall working the

23  afternoons.

24   Q.   Okay.

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 68

1       A.    And when the day shift became available, I
2    bid to days.
3       Q.    Okay.  Do you remember about when that was?
4       A.    No.
5       Q.    And were the shifts -- We talked about shifts
6    in the context of drill instructors.  Were the shifts
7    the same for drill sergeants, the hours?
8       A.    Yes.
9       Q.    Okay.  The -- You're switched to the day
10   shift.  You were at the boot camp from 2004 up until --
11   Was it 2010?  Is that accurate?
12      A.    1996 to 2010.
13      Q.    I apologize.  1996 until 2010.
14            You were a drill sergeant from 2004 to 2010,
15   correct?
16      A.    That's correct.
17      Q.    Okay.  Did you switch to the day shift -- do
18   you recall whether it was within a year of leaving the
19   boot camp?  Within two years?  Can you estimate?
20      A.    I don't recall.
21      Q.    Were your -- Let's start with your duties and
22   responsibilities as a drill sergeant.  First, would
23   they have been different whether you were on the day
24   shift or the afternoon shift?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 69

1      **A.**    Pretty much the same.

2      **Q.**    Okay.  And what were those duties and

3   responsibilities?

4      **A.**    To ensure that the drill instructors were

5   properly training the inmates how to march, exercise;

6   that they would get them to school on time; that they

7   would get showers, get fed on time, and participated in

8   any of the other extracurricular activities that were

9   assigned.

10     **Q.**    I neglected to ask.  Was there a lieutenant

11  assigned to each shift?

12     **A.**    Yes, sir.

13     **Q.**    How many lieutenants?

14     **A.**    Two to three.

15     **Q.**    So two to three sergeants and two to three

16  lieutenants on a shift?

17     **A.**    Yes.  I believe, with sergeants, there may

18  have been four, depending.

19     **Q.**    And was that level of staffing consistent

20  during your entire time with the boot camp both as a

21  drill instructor and drill sergeant?

22     **A.**    Yes.

23     **Q.**    When you were a drill sergeant at the boot

24  camp working the afternoon shift, did you supervise the

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 73

1    assignments; sometimes you wait around in the barracks

2    while your drill instructor is getting the inmates

3    ready for physical fitness; come outside, exercise with

4    the platoon and the drill instructor; eat; shower;

5    continue to make rounds.  Sometimes we do lunch reliefs

6    for the drill instructors, participate in the

7    graduation ceremonies.  Those were the

8    responsibilities.

9        Q.    Okay.  And that was what you would do on a

10    daily basis?

11        A.    Graduation wasn't a daily basis.

12        Q.    Otherwise.

13        A.    Yes.

14        Q.    Okay.  Is there anything else you can recall

15    doing on a daily basis as a correctional sergeant --

16    excuse me -- as a drill sergeant?

17        A.    Not at the moment.

18        Q.    Okay.  And your -- Would it be fair to say

19    that your primary responsibility was to supervise the

20    correctional officers, the drill instructors?

21        A.    As a drill sergeant?  Yes.

22        Q.    As a drill sergeant.  Yes.

23              And are you familiar with the term

24    "front-line supervisor"?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 74

1     **A.**   Yes.

2     **Q.**   What does that mean to you?

3     **A.**   The first supervisor that your subordinates

4  would report to.

5     **Q.**   Okay.  As a drill sergeant, were you a

6  front-line supervisor to drill instructors?

7     **A.**   Yes, sir.

8     **Q.**   Okay.  And as a front-line supervisor of

9  drill instructors, what would you do?

10    **A.**   I would address any concerns that they may

11 have, any concerns they were having with the inmates,

12 like noncompliance; speak to the inmates; have them

13 write them up if necessary; talk to the inmates, let

14 them know what their punishment was going to be,

15 whether they would lose visits or phone calls.  That's

16 all I could think of at the moment.

17    **Q.**   Okay.  And what would you do if you found

18 that a drill instructor was not doing his or her job?

19    MR. TOWNSEL:  Objection:  hypothetical, vague,

20 overbroad.

21         Please answer if you know.

22 BY THE WITNESS:

23    **A.**   If I thought that a drill instructor was not

24 doing their job, I would speak with my supervisor, the

Royal Reporting Services, Inc.
312.361.8851

Page 79

1   disciplinary event on one occasion and this was that

2   occasion.  Do you recall any other discipline you

3   effectuated against any correctional officers, while

4   you were a drill sergeant, to drill instructors?

5       **A.**   No, I don't recall any other situations.

6       **Q.**   Do you recall -- And we may have covered

7   this; I apologize -- how many drill instructors you

8   supervised on each shift?

9       **A.**   Maybe two to three.

10      **Q.**   And in the course of your supervision, did

11  you ever participate in the drill instruction

12  activities with the drill instructors?

13      **A.**   Yes, I did.

14      **Q.**   Okay.  And what type of activities did you

15  do?

16      **A.**   Physical fitness or PT, instruct them on

17  marching.  They did competitions for marching.  So I

18  would grade them, grade the drill instructors as to his

19  effectiveness in marching these inmates.  We test to

20  make sure that they can go to each phase.  They would

21  have to do so many different commands of marching in

22  order to move on to the next phase.  And we would test

23  them then.

24      **Q.**   When you were working on marching, for

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 80

1   instance, were you actually participating in marching

2   with them?

3       A.   Yes.  At times.

4       Q.   And when you participated in PT/physical

5   fitness, were you engaged in the physical activity with

6   the drill instructor and the inmates?

7       A.   That's correct.

8       Q.   And you would do this routinely?

9       A.   Yes, sir.

10      Q.   And that's because it was part of your job as

11  a first-line supervisor?

12      A.   Yes.

13      Q.   Okay.  When you were a drill sergeant, did

14  you ever have a drill instructor of yours that you were

15  supervising call in sick?

16      A.   I'm sure that I did, sir.

17      Q.   Okay.  Or otherwise not show up for work.  Do

18  you recall any specific time?

19      A.   No, I don't.

20      Q.   Okay.  You said you're sure that it did

21  happen.  What would have been -- What would have

22  happened if a -- one of your subordinates didn't show

23  up for work, whether they were sick or they just didn't

24  come to work?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 81

1     **A.**   Assign someone else to their assignment.

2     **Q.**   Okay.  Is it possible that you would have

3  filled in in the assignment as a drill sergeant?

4     **A.**   I recall times when I sat there supervising

5  the inmates, yes.

6     **Q.**   Okay.  When -- When filling in for the drill

7  instructor?

8     **A.**   Yes.  If we were short -- short of staff, I

9  recall sitting in on the barracks, yes.

10    **Q.**   Okay.  What does that mean, "sitting in on

11  the barracks"?

12    **A.**   Performing the job of the drill instructor.

13    **Q.**   Okay.  For an entire shift?

14    **A.**   Yes.

15    **Q.**   How many times do you recall doing that?

16    **A.**   I don't recall the exact amount of times, but

17  I do recall doing it.

18    **Q.**   Was it more than once?

19    **A.**   I can't say.

20    **Q.**   Okay.  You can't say because you don't

21  remember?

22    **A.**   Exactly.

23    **Q.**   So as a correctional sergeant, if there was a

24  shortage of staff or one of your subordinates didn't

Page 82

1   come to work that day, you may have to fill in for

2   them?

3       A.   Yes.  It happened, yes.

4       Q.   Okay.  As a drill sergeant, were you also

5   expected to -- to be able to assist in case of

6   emergency?

7       A.   Yes.

8       Q.   Okay.  And you mentioned, when you were a

9   drill instructor, that there was that one incident

10  where an inmate attempted to walk out of the facility.

11  Would you have considered that an emergency situation?

12      A.   Yes.

13      Q.   Okay.  So an attempted escape would be an

14  emergency situation?

15      A.   Yes, sir.

16      Q.   Okay.  Would a medical situation -- Would

17  there be a medical emergency that, as a drill sergeant,

18  you would have to potentially assist in?

19      A.   Yes.

20      Q.   Okay.  If there was a fight at the boot camp,

21  as a correctional sergeant -- or drill sergeant --

22  excuse me -- would you also potentially have to assist

23  in that type of situation?

24      A.   Yes.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 84

1    BY THE WITNESS:

2         A.    No, sir, I don't recall.

3         Q.    Excuse me.

4              I believe you indicated that the attempted

5    escape was while you were a drill instructor, not a

6    drill sergeant.  Is that accurate?

7         A.    That's correct.

8         Q.    Okay.  Do you recall, as a drill sergeant,

9    ever dealing with a medical emergency?

10        A.    No, I don't recall, sir.

11        Q.    Okay.  Do you recall, as a drill sergeant,

12   ever being called to help assist in a fight or assist

13   in breaking up a fight?

14        A.    No, I don't recall.

15        Q.    You mentioned participating in certain

16   activities as a drill sergeant where you would help to

17   assist the drill instructors with -- Is it fair to say

18   that, in those cases, you would come into contact with

19   the inmates?

20        A.    Yes, sir.

21        Q.    Okay.  Would you be in contact with inmates

22   on a daily basis as a drill sergeant?

23        A.    Yes, sir.

24        Q.    Okay.  Throughout the day?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 85

1     **A.**   On occasions, yes, throughout the day.

2     **Q.**   Okay.  And other than what we've discussed,

3  what sort of contact or interaction would you have with

4  inmates?

5     **A.**   Repeat the question, please.

6     **Q.**   What sort of contact -- direct contact would

7  you have with the inmates on a daily basis?

8     **A.**   Only if there was a need for discipline or if

9  the inmate was acting out, they would be sent to the

10  drill sergeant.  We would talk to them, address

11  write-ups.  If the -- If the drill instructor has

12  written that inmate up, we would address that with the

13  inmates.  Other than that, as a drill sergeant, no

14  direct contact.

15     **Q.**   Okay.  You said in cases where you may

16  have -- there may be a disciplinary issue with an

17  inmate, they may be sent to see you.  Were you in

18  charge of disciplining the inmates?

19     **A.**   Yes.

20     **Q.**   Okay.  So as a drill sergeant, you were in

21  charge of disciplining both correctional officers and

22  inmates?

23     **A.**   Yes.

24     **Q.**   Okay.  What type of circumstances warranted

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 87

1      A.    Yes.

2      Q.    Okay.

3      A.    But from a distance.

4      Q.    Okay.  How much of a distance, for instance,

5   in PT -- when doing PT?

6      A.    The drill instructor would be in the front of

7   the platoon, and I would stand in the back to monitor

8   and see who was participating and who was not

9   participating.

10     Q.    Okay.  Can you -- Would you be able to

11  estimate how close you would be to the closest inmate?

12     A.    5, 10 feet away.

13     Q.    Okay.  Would the same be true of when you

14  were marching with the inmates?

15     A.    Yes.

16     Q.    Okay.  In your complaint, you indicated that

17  the drill sergeant position required you to work

18  outdoors in extreme weather conditions.  Would you

19  agree that that's what you alleged in your complaint?

20     A.    Can you repeat that, please?

21     Q.    Would you agree that you allege in your

22  complaint that the drill sergeant -- your drill

23  sergeant position required you to work outdoors in

24  extreme weather conditions?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 88

1      **A.**    That's correct, sir.

2      **Q.**    Okay.  Can you please explain what you meant

3  by that?

4      **A.**    We were required to take a physical fitness

5  test twice a year, and that occurred in the months of

6  April and October.  And during those times, we were

7  running for the fitness test.  And even during cold

8  weather, we ran.  We were required to run in cold

9  weather with the inmates.

10      **Q.**    Was the boot camp -- Did the boot camp have

11  an outdoor component year-round?

12      **A.**    Yes.

13      **Q.**    Okay.  So even in the dead of winter, you

14  might be outside, as a correctional sergeant,

15  supervising correctional officers or inmates?

16      **A.**    Change came into play where -- where a memo

17  had been generated that if temperatures were of a

18  certain heat or of a certain cold, then not to be

19  outside.  So they would put a red flag out.  After some

20  time, the red flag was put out so that the inmates

21  wouldn't be injured, as well as the staff.

22      **Q.**    Okay.  Do you remember when that -- Is that a

23  policy change you're describing or a practice change of

24  the boot camp?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 90

1    everybody.

2         MR. TOWNSEL:  One o'clock?

3         MR. GOLDEN:  That would be fine.

4         THE WITNESS:  Yes.

5         MR. TOWNSEL:  Great.  Thanks.

6         MR. GOLDEN:  We'll go off the record.

7         THE VIDEOGRAPHER:  We are now going off the record

8    at 12:25 p.m.

9                        (A lunch break was had.)

10        THE VIDEOGRAPHER:  We are now back on the record

11   at 1:05 p.m.

12   BY MR. GOLDEN:

13        Q.   Sergeant Santos-Means, is it correct that you

14   were diagnosed with sarcoidosis while you were a drill

15   sergeant at boot camp?

16        A.   That's correct, sir.

17        Q.   Okay.  And when exactly was that?

18        A.   Approximately September of 2008.

19        Q.   And how were you diagnosed?

20        A.   Can you rephrase the question, please?

21        Q.   Sure.

22             Were you -- Did you go to your doctor and

23   say, I've been feeling a certain way?  Was it -- Did

24   you get a routine physical?  How did a doctor come to

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 91

1    tell you you had sarcoidosis?

2         A.    I was in training at Maywood College.  And

3    from there, I started experiencing shortness of breath.

4    That was during the time of in-service training.  I

5    left -- I believe it was a Wednesday of the training --

6    went to the emergency room.  And the doctors performed

7    tests.

8         Q.    And what emergency room was it?

9         A.    South Suburban Hospital.

10        Q.    And this was in September of 2008?

11        A.    Yes, sir.

12        Q.    You were seen by an emergency room doctor?

13        A.    Yes, sir.

14        Q.    Okay.  Were you -- Was that the doctor who

15   made the diagnosis?

16        A.    Yes, sir.

17        Q.    And what were you told exactly?

18        A.    I believe I was asked if I smoked and if I

19   had heard of sarcoidosis and told them no.  And I was

20   told that that's what I had.

21        Q.    First, do you smoke?

22        A.    No, sir.

23        Q.    Have you ever smoked?

24        A.    Yes.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 94

1      MR. GOLDEN:  The statement that there was mildew

2   in the carpet.

3   BY THE WITNESS:

4      A.    You could smell the carpet.

5      Q.    Your answer is, that's why you believed that

6   it was mildew?  No other reason besides you could smell

7   the mildew?

8      A.    Correct.

9      Q.    You weren't engaged in physical activity at

10   the time?

11      A.    No, sir.

12      Q.    And so you went to South Suburban Hospital

13   and were -- Were you told -- I believe you testified

14   that you were asked whether you had heard of

15   sarcoidosis and then you were told what it was.  Were

16   you told you had it?

17      A.    Can you repeat that, please?

18      Q.    Were you actually told, when you went to the

19   emergency room, that you had sarcoidosis?

20      A.    Yes.

21      Q.    Okay.  Did they run any tests to make that

22   determination?

23      A.    Yes, they did.

24      Q.    What sort of tests?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 95

1         MR. TOWNSEL:  Object to form.

2              Please answer.

3    BY THE WITNESS:

4         A.   A biopsy, a lung biopsy; chest X-rays, CT CAT

5    scan.

6         Q.   Were you prescribed any medication?

7         A.   I can't recall at the time.

8         Q.   After you were diagnosed with sarcoidosis,

9    did you follow up with any other physician?

10        A.   Yes, I did.

11        Q.   Okay.  And who was that?

12        A.   Dr. Assefa.

13        Q.   And was that shortly after you were

14   diagnosed?

15        A.   I believe it was.

16        Q.   Was Dr. Assefa your primary care physician?

17        A.   He was.

18        Q.   Is he still your primary care physician?

19        A.   No, he's not.

20        Q.   And when you say you followed up shortly

21   thereafter with Dr. Assefa, would that have been within

22   a week's time?

23        A.   I'm not sure.

24        Q.   Okay.  And what did you tell Dr. Assefa?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 106

1      Q.   So that's the day shift?

2      A.   Yes.

3      Q.   Did you discuss your diagnosis of sarcoidosis

4   with anyone else?

5      A.   Yes.

6      Q.   Who?

7      A.   I believe it was the entire roll call area,

8   everyone that reported for duty on a specific date.

9      Q.   What date would that be?

10      A.   Sometime in 2009.

11      Q.   Please describe how that occurred.

12      A.   I started to -- I started to experience

13   shortness of breath due to many individuals at my job

14   smoking.  I stood in roll call, and I requested that my

15   coworkers not smoke in the entrance building as well as

16   in the front.  I let them know then that I had a lung

17   disease and it was called sarcoidosis and that smoking

18   affected me.  And that's how everyone else came to know

19   about it.

20      Q.   Other than what you just said, can you recall

21   saying anything else to your coworkers at that time?

22      A.   No, I can't recall anything else.

23      Q.   And you said this was during roll call?

24      A.   Yes, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 107

1    Q.    Tell me about roll call.  What is roll call?

2    A.    Roll call is a meeting that is held before

3 each individual goes to their assignments.  It's where

4 the assignments are given out.  They're brought up to

5 know as to what's going on with the department or if

6 any inmates need to go out for medical, dental, who

7 would go to what assignments.  So it's like a

8 debriefing before their assignments.

9    Q.    Okay.  And are correction -- Excuse me.

10        Are drill instructors at the roll call

11 meeting?

12    A.    Yes.

13    Q.    Are drill sergeants at the roll call meeting?

14    A.    Yes, sir.

15    Q.    And I don't know that I clarified, but are

16 lieutenants referred to as drill lieutenants?

17    A.    Drill lieutenants.

18    Q.    Drill lieutenants.

19        Are drill lieutenants also at the roll call

20 meetings?

21    A.    Yes, sir.

22    Q.    Is there anyone else at the roll call

23 meeting?

24    A.    The captain.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 108

1      Q.    Captain.  Okay.

2            Anyone else?

3      A.    That's pretty much it.

4      Q.    Okay.  And a roll call is once per day?

5      A.    One per day, yes.

6      Q.    So this was the roll call meeting for -- Was

7   it the day shift?

8      A.    That's correct, sir.

9      Q.    Okay.  Do you remember -- Excuse me.

10           You don't recall the specific day?

11     A.    Are you asking a day that I --

12     Q.    If you recall.

13     A.    -- announced --

14     Q.    Yeah, the day you announced.  Yes.

15     A.    Sometime in November 2009.

16     Q.    And the smoking that you mentioned, where was

17   the smoking occurring?

18     A.    In the front building, the front entrance

19   building, and on the front entranceway.

20     Q.    I would like to return to that, but I don't

21   think I've asked you yet to -- if you can describe the

22   layout of boot camp.  You just mentioned there was a

23   front entrance building.  What other buildings or

24   structures are there in the boot camp facility?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 110

1    located?

2         A.    2801 Rockwell.

3         Q.    In Chicago?

4         A.    Yes, sir.

5         Q.    Okay.  And can you describe, to the best of

6    your ability, where the smoking was occurring in the

7    front entrance and the front entrance -- building of

8    the front entranceway?  I think you said separately.

9         A.    The front entrance door, right at the door,

10   and inside the gatehouse, which is that first building.

11        Q.    When you say "inside the gatehouse" -- so

12   that would be indoors?

13        A.    Yes, sir.

14        Q.    If we can start with inside the -- the

15   entrance building, where inside the entrance building

16   were people smoking?

17        A.    Right at the door area.

18        Q.    Right at the doorway?

19        A.    Mm-hmm.

20        Q.    Okay.  Was there a way to exit through the

21   door area without encountering people smoking?

22        A.    No.

23        Q.    Was this every day around that time in

24   November of 2009?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 111

1     A.   Well, it was not every day.

2     Q.   Okay.  How often would it occur?

3     A.   It was November.  Quite a bit.  It was cold.

4     Q.   When you say "quite a bit," would it occur --

5     Did you work five days a week?

6     A.   Yes, I did.

7     Q.   Okay.  Would it occur more than two days a

8     week?

9     A.   Say approximately two to three times, enough

10    to where I had to file a complaint.

11    Q.   Okay.  And who was smoking in the entranceway

12    of the entry building?

13    A.   David Rodriguez.

14    Q.   Who is -- Is David Rodriguez a

15    correctional -- excuse me -- a drill instructor?

16    A.   He was a lieutenant.

17    Q.   Lieutenant.

18         Anyone else?

19    A.   Lieutenant -- Ms. Jacqueline Rodriguez.

20    Q.   And who was Jacqueline Rodriguez?

21    A.   She was a drill instructor.

22    Q.   Anyone else that you can recall?

23    A.   Some of the civilians.

24    Q.   Anyone else that you can recall?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 113

1    instructors, but what is your relationship to civilian

2    staff?

3        A.   The relationship to them was to make sure

4    that they were never in harm's way when it came to the

5    inmates.

6        Q.   Did you have a supervisory -- supervisory

7    authority over civilian staff?

8        A.   Not directly, no.

9        Q.   Okay.  Those individuals who were smoking in

10   the front entrance of the front entranceway building,

11   were they the same individuals who were also outside of

12   the building?

13       A.   Yes.

14       Q.   Was there anyone else who was -- I think we

15   talked about just inside the building, inside the

16   doorway.  Was there anyone else you recall only being

17   outside the doorway?

18       A.   No, I don't recall.

19       Q.   Okay.  And are we talking about four or five

20   individuals, generally?

21       A.   Not all at the same time.

22       Q.   Okay.  About how many people would be there

23   when you would come in and out of the building,

24   generally?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 114

1      **A.**    Generally, two.

2      **Q.**    Okay.  And would sometimes that only be

3   correctional officers?

4      **A.**    It was correctional officers, the lieutenant,

5   and civilian staff at various times.

6      **Q.**    Did you ever ask those individuals to stop

7   smoking?

8      **A.**    Yes, I did.

9      **Q.**    Other than at roll call that we talked about

10  earlier.

11     **A.**    Yes, I did, sir.

12     **Q.**    Okay.  And do you recall when you asked them

13  to stop smoking?

14     **A.**    It was during that time frame of November

15  2009.

16     **Q.**    Was it before or after you made the

17  announcement at roll call?

18     **A.**    Probably both.

19     **Q.**    And do you remember what you said to the

20  individuals?

21     **A.**    I do recall telling them that I had a

22  condition that affects my lungs and cigarette smoke

23  affects me; it causes me to have shortness of breath;

24  do you mind not smoking inside the facility, inside the

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 115

1   building, or not -- you know, to go 15 feet away from

2   the door.

3       Q.   And did you have -- Did you say this to all

4   of the individuals you mentioned or just some of them?

5       A.   In roll call, I said it to all the

6   individuals.

7       Q.   Okay.  Do you recall any -- talking about

8   this with any individual specifically outside of roll

9   call?

10      A.   Other than the complaint with the City of

11  Chicago?

12      Q.   Other than the complaint.

13      A.   Family members.

14      Q.   Which family members?

15      A.   My mother.

16      Q.   What's your mother's name?

17      A.   Maddie Means.

18      Q.   What did you say to your mother?

19      A.   That I'm being affected by the cigarette

20  smoke at work.

21      Q.   Do you recall saying anything else to your

22  mother about the cigarette smoke?

23      A.   No.

24      Q.   Do you recall what your mother said to you?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 118

1  issue?

2      A.   I -- Yes.

3      Q.   Who?

4      A.   Therese Conrad.

5      Q.   Who is Therese Conrad?

6      A.   She was the timekeeper.

7      Q.   Civilian staff?

8      A.   Yes, sir.

9      Q.   What did you say to Ms. Conrad?

10     A.   I went to her office, and I asked her if she

11 would come up to the front gatehouse and tell me what

12 she smelled or if she smelled anything.  She came up to

13 the front, and she acknowledged that she smelled

14 cigarettes and that she had this complaint too about

15 individuals smoking and nothing had ever been done.

16     Q.   Do you remember when you spoke to Ms. Conrad?

17     A.   That was on or about November 18th, 2009.

18     Q.   Is there a reason you remember that specific

19 date?

20     A.   Because it was the same day that I did -- I

21 believe I filed the complaint or similar -- or close to

22 the date that I filed the complaint.

23     Q.   And that was with the City of Chicago?

24     A.   Yes, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 119

1      Q.   And that would be the same complaint that you

2   reference in your complaint --

3      A.   Yes, sir.

4      Q.   -- in this case?

5      A.   Mm-hmm.

6      Q.   That's yes?

7      A.   Yes, sir.

8      Q.   Do you recall saying anything else to

9   Ms. Conrad?

10     A.   No, not -- No.

11     Q.   Did she say anything else to you?

12     A.   Other than it's a shame that they continue to

13   do that, no, I don't recall her saying anything else.

14     Q.   Okay.  Did you complain about smoke in the

15   front entranceway building to anyone else at the Cook

16   County Sheriff's Office?

17     A.   Yes, I did.

18     Q.   Who?

19     A.   John Harrington.

20     Q.   Who is John Harrington?

21     A.   He's the executive director of the boot camp.

22     Q.   And when did you complain about the smoke in

23   the entranceway -- smoking in the entranceway to John

24   Harrington?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 120

1      A.    It was the following week when he returned to

2    work.

3      Q.    Would that be the week after you filed the

4    complaint with the City of Chicago?

5      A.    Yes, sir.

6      Q.    And what did you say to him?

7      A.    I went to Mr. Harrington.  And I informed him

8    that I had a lung disease, that I was diagnosed with

9    sarcoidosis; and various elements may cause shortness

10   of breath; and smoking was one of them.  I told him how

11   individuals continued to smoke at the gatehouse and

12   that it was affecting me.

13     Q.    Do you remember what he said, if anything, to

14   you?

15     A.    I believe he said he would look into it.

16     Q.    And this was on or about a week after

17   November 18th, 2009?

18     A.    That's correct.

19     Q.    Did you say anything else to him?

20     A.    No, I don't believe I did.

21     Q.    Did he say anything else to you?

22     A.    I don't recall him saying anything else.

23     Q.    Did you have any other conversations --

24   Excuse me.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 121

1          Was anyone else present during that

2     conversation?

3     A.    No.

4     Q.    Do you remember where the conversation

5     occurred?

6     A.    Where did it occur?

7     Q.    Yes, ma'am.

8     A.    I went into his office.

9     Q.    Do you remember what time of day?

10     A.    No.  I believe it was close to time to go

11     home.

12     Q.    During your shift?

13     A.    Yes, sir.

14     Q.    Any other discussions with John Harrington as

15     to the issue concerning smoking?

16     A.    Not that I recall, sir.

17     Q.    Okay.  Did you speak about your complaint

18     with regard to -- Did you speak about the issue with --

19     the issue you had with individuals smoking in the front

20     entranceway with anyone else at the Sheriff's Office?

21     A.    Yes.

22     Q.    Who?

23     A.    Captain Pankowitz.

24     Q.    What did you say to Captain Pankowitz?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 122

1    **A.**   I went into his office.  Again, I told him

2    about my illness, and I asked him if he could announce

3    at roll call -- to ask those who smoked not to smoke in

4    the gatehouse or the front entrance.

5        **Q.**   And what did he say to you?

6        **A.**   He said that he would do it.

7        **Q.**   Did he?

8        **A.**   He did.

9        **Q.**   Did he do it at the next roll call?

10       **A.**   He did.

11       **Q.**   And when did this conversation occur?

12       **A.**   Maybe the 18th or 19th of November 2009.

13       **Q.**   So around the time of your complaint to the

14   City of Chicago?

15       **A.**   Yes.

16       **Q.**   Was anyone else present when you spoke to

17   Captain Pankowitz?

18       **A.**   Not to my knowledge.

19       **Q.**   Did you have any other conversations

20   with Captain -- Pardon me.

21            If we can also -- If we can clarify, was

22   Captain Pankowitz your supervisor?

23       **A.**   He was a captain.

24       **Q.**   So that would be someone who was -- You were

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 130

1        Just to finish the complaint with the City of
2    Chicago, did you -- after you were contacted by the
3    City on that one occasion to discuss the questionnaire
4    that you filled out, did you have any other contact
5    with anyone from the City of Chicago relative to your
6    complaint?
7        **A.**   Relative to the smoking complaint?
8        **Q.**   Yes.
9        **A.**   Not to my knowledge.
10       **Q.**   Do you know what ever became of your
11   complaint to the City of Chicago?
12       **A.**   I believe they got in touch with John
13   Harrington.  And then about sometime in January
14   of 2010, he put out a memo to be read at roll call that
15   individuals not smoke at the gatehouse, or 15 feet away
16   in a designated area.
17       **Q.**   You say you believe the City -- someone from
18   the City got in touch with John Harrington.  Why do you
19   say that?
20       **A.**   Because I received a letter.
21       **Q.**   So you did receive correspondence from the
22   City of Chicago after that conversation with the
23   individual about your questionnaire?
24       **A.**   Right.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 131

1      Q.    What did the letter say?

2      A.    It just stated the nature of my complaint,

3  and then it stated at the bottom of the letter that

4  John Harrington had been notified.

5      Q.    Did you follow up on the letter with anyone

6  from the City?

7      A.    No.

8      Q.    Did you speak to John Harrington about the

9  letter?

10     A.    No.

11     Q.    Okay.  Do you remember when you received the

12  letter?

13     A.    I believe I called and asked them what was

14  the status of the complaint that I filed, and that's

15  when the letter was, I think, e-mailed to me or scanned

16  to me or faxed to me.

17     Q.    Okay.  Do you remember when you received it?

18     A.    No.

19     Q.    Do you remember when you called the City to

20  ask about the status of your complaint?

21     A.    No, I don't.

22     Q.    After John Harrington issued a memo in

23  January of 2010, did the smoking stop in front of the

24  building and in the entryway?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 132

1    **A.**   Not completely.

2    **Q.**   What do you mean by that?

3    **A.**   At times, when I would come to work, I would

4   see individuals standing in front of the door.  I was

5   driving to the parking lot, and I would see individuals

6   standing in front of the door.  And then when I started

7   walking towards the door, they would move away from the

8   door.

9    **Q.**   Okay.  So was there ever -- After John

10  Harrington's memo went out in January of 2010, when you

11  arrived at the door, was anyone ever there smoking?

12   **A.**   Can you repeat that, please?

13   **Q.**   Sure.

14          After John Harrington issued a memo

15  concerning the smoking in January of 2010, did you ever

16  encounter -- when you arrived at the door to either

17  enter or exit boot camp, was anyone ever there smoking?

18   **A.**   I can't recall at this moment.

19   **Q.**   Okay.  Do you recall anyone being there

20  smoking?

21   **A.**   As I said, on my way to work, I would see

22  them near the door; but then once I got out of my car

23  to walk to the building, they would leave away from the

24  door.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 133

1      Q.    Okay.  So by the time you got to the
2    building, no one would be there?
3      A.    Exactly.
4      Q.    Okay.  You said you were off work as a result
5    of the smoking?
6      A.    Yes.  I believe it contributed to me doing
7    that.
8      Q.    Okay.  Are you referring to when you went on
9    disability leave?
10     A.    Yes, sir.
11     Q.    Okay.  And we'll get to that.
12           Is there anything that we haven't talked
13   about relative to your complaint regarding smoking at
14   the boot camp?
15     MR. TOWNSEL:  Objection:  vague, overbroad.
16           Please answer the question if you can.
17   BY THE WITNESS:
18     A.    Those are the only details I can remember at
19   this time.  I would be happy to inform you if they
20   should come to mind.
21     Q.    Okay.  Give me just a moment here.
22           One final question as to the smoking.  Is it
23   fair to say -- When there was smoking in that area
24   during the period that we've been talking about, is it

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 134

1    fair to say you wouldn't linger in the entryway; you

2    would simply exit the building and enter the building

3    as quickly as possible?

4        **A.**    That's correct.

5        **Q.**    When we talked -- we started talking about

6    the smoking, we were in the middle of talking about the

7    period of when you were diagnosed with sarcoidosis.

8    When you went to see, I believe it was Dr. Assefa,

9    following the diagnosis at South Suburban Hospital,

10   were you having any symptoms at that time?

11       **A.**    I believe they were mild symptoms.

12       **Q.**    Is that as compared to your symptoms when you

13   went to the hospital?

14       **A.**    Yes.

15       **Q.**    Okay.  And what symptoms were you having when

16   you saw Dr. Assefa?

17       **A.**    Still shortness of breath but not as often as

18   it was when I first went to the hospital.

19       **Q.**    Okay.  And just generally speaking, the

20   symptoms of sarcoidosis that you've experienced since

21   you've been diagnosed, you talked about shortness of

22   breath, tightness in your chest, I believe, things of

23   that nature.  Are there any symptoms that you haven't

24   described already?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 144

1    Q.   Any other medication -- Do you remember your
2  dosage?
3    A.   I don't remember the dosage.
4    Q.   Okay.  Did you take it --
5    MR. TOWNSEL:  Objection.  I'm going to object to
6  that past question as being compound.  Only one of the
7  two questions -- answers were given.
8         Please continue.
9  BY MR. GOLDEN:
10   Q.   I believe -- You don't recall what dosage of
11 Zantac or Xanax that you took?
12   A.   No, sir.
13   Q.   Okay.  Do you remember how often you took it?
14   A.   As needed.
15   Q.   How often was that?
16   A.   Whenever I would get depressed.  Whenever I
17 would get depressed.  I don't know.
18   Q.   Okay.  Any other medication that Dr. Assefa
19 prescribed you?
20   A.   There were several, but I can't recall what
21 they were.
22   Q.   Okay.  You were seeing Dr. Tepeli at the same
23 time you were seeing Dr. Assefa?
24   A.   Yes.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 145

1    Q.    Okay.  And who was Dr. Tepeli?

2    A.    Pulmonologist.

3    Q.    And why would you see Dr. Tepeli?

4    A.    Because he specialized in lung care.

5    Q.    And how often would you see him?

6    MR. TOWNSEL:  Objection as to time frame.

7          Please answer.

8  BY THE WITNESS:

9    A.    I don't -- I don't recall how often I was

10  seeing him.

11   Q.    Do you recall when you started seeing him?

12   A.    I believe -- I believe, sometime in 2010.

13   Q.    Do you continue to see Dr. Tepeli?

14   A.    If needed, yes.

15   Q.    Okay.  When is the last time you saw him?

16   A.    Probably almost two years now.

17   Q.    Two years ago?

18   A.    Almost two years now.

19   Q.    So if you haven't seen Dr. Assefa in one and

20  a half to two years and it's almost two years having

21  seen Dr. Tepeli, you haven't seen a doctor relative to

22  your sarcoidosis in about two years?

23   A.    No.  I have seen a doctor.

24   Q.    Who have you seen?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 151

1      Q.    What type of inhaler?

2      A.    Albuterol inhaler.

3      Q.    Okay.  Prescribed by Dr. Telepi?

4      A.    Dr. Tepeli, yes.

5      Q.    Tepeli.  Excuse me.

6            Even though you experience these symptoms

7   recently, you haven't seen a doctor for sarcoidosis for

8   at least a year?

9      A.    Yes.

10     Q.    Okay.  Are you ever symptom-free?

11     A.    I wouldn't say "symptom-free."  I would just

12  say they don't flare up.

13     Q.    How long do those periods last?

14     A.    As long as I am not in an environment where

15  something causes it to react.

16     Q.    Can it be an extended period of time?

17     A.    It can.

18     Q.    Okay.  More than a couple weeks?

19     A.    Yes.

20     Q.    More than a couple months?

21     A.    Yes.

22     Q.    What's the longest you've gone without

23  experiencing any symptoms?

24     A.    Maybe a year.  A little over a year.

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 152

1      Q.   Okay.  When was that?

2      A.   It was right before August 2012, when I was

3  able to come back to work.

4      Q.   When you had those periods where you're

5  relatively symptom-free, would you refer to that as the

6  sarcoidosis being in remission?

7      A.   Yes, sir.

8      Q.   Okay.  I just want to talk to you, before we

9  move onto some of your -- the allegations in your

10  complaint specifically, about your diagnosis of asthma,

11  bronchial asthma.  Would you agree that your complaint

12  is based on your diagnosis of sarcoidosis but also

13  having asthma?

14      A.   Can you repeat that, please?

15      Q.   Okay.  Would you agree that the allegations

16  in your complaint are also based on having asthma?

17      A.   In addition to --

18      Q.   Sarcoidosis.

19      A.   Yes.

20      Q.   Okay.  When were you diagnosed with asthma?

21      A.   I'm not sure of the diagnosis of the asthma.

22      Q.   Did you have asthma as a child?

23      A.   No, sir.

24      Q.   Do you remember who diagnosed you with

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 153

1   asthma?

2       **A.**   Dr. Tepeli.

3       **Q.**   So if -- The diagnosis was, at the earliest,

4   in 2010?

5       **A.**   Yes.  That's relatively correct.

6       **Q.**   Was it around that time when you started

7   seeing Dr. Tepeli?

8       **A.**   I don't know the exact time.

9       **Q.**   Do you remember what he told you?

10      **A.**   That I had bronchial asthma, asthma, and the

11  sarcoidosis.

12      **Q.**   What's the difference between bronchial

13  asthma and asthma?

14      MR. TOWNSEL:  Object to form.

15          Please answer if you know.

16  BY THE WITNESS:

17      **A.**   I'm not quite sure of the difference.  I'm

18  not quite sure.

19      **Q.**   Is it your understanding that you have both?

20      **A.**   Excuse me?

21      **Q.**   It's your understanding, though, that you

22  have both?

23      **A.**   Yes.

24      **Q.**   Okay.  And do you recall anything else other

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 155

1    such as the flu?

2        A.   He didn't mention the flu.

3        Q.   Okay.  Chicken pox?

4        A.   He didn't mention chicken pox.

5        Q.   Can you think of any other airborne --

6    specifically, any other airborne sickness besides

7    tuberculosis?

8        MR. TOWNSEL:  Object to the form of the question.

9    Are you asking her what the doctor told her, or are you

10   just asking her to think of something?

11       MR. GOLDEN:  I'll rephrase.

12   BY MR. GOLDEN:

13       Q.   I believe you testified or stated Dr. Tepeli

14   indicated that you should avoid individuals who had

15   airborne illnesses, and I said such as tuberculosis.

16           Did Dr. Tepeli mention tuberculosis

17   specifically?

18       A.   Yes, he did.

19       Q.   Okay.  Did he mention specifically any other

20   airborne illnesses?

21       A.   No, he did not.

22       Q.   Okay.  You don't recall, or he did not?

23       A.   Not that I recall.

24       Q.   Okay.  How do you understand that term,

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 156

1    "airborne illness"?

2        A.    I understand it as anything that could be

3    transmitted through the air, cough, sneeze.

4        Q.    So did you understand the instruction is to

5    avoid anyone who had an illness that could be

6    transmitted through the air?

7        A.    Excuse me?

8        Q.    Did you understand Dr. Tepeli telling you to

9    avoid anyone with an airborne illness as him telling

10   you to avoid anyone with an illness that could be

11   transmitted through the air?

12       A.    Yes.  If I know -- If I know of that

13   individual, yes.

14       Q.    Okay.  Have you seen any other physicians

15   besides Dr. Tepeli related to your diagnosis --

16   diagnoses of asthma and bronchial asthma?

17       A.    Not to my knowledge.

18       Q.    Okay.  Other than the medication that we've

19   discussed, the inhalers and the nebulizer, have you

20   been prescribed any other medication for asthma or

21   bronchial asthma by Dr. Tepeli?

22       A.    No, sir.

23       Q.    Okay.  Did you ever tell anyone at the Cook

24   County Sheriff's Office that you had asthma or

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 162

1    And she stated to me that she herself was sick.  And

2    that was pretty much the gist of our conversation.

3        Q.    Okay.  Do you recall anything else specific

4    that either you said to her or that she said to you as

5    part of that conversation?

6        A.    I believe she stated that Vito Zaccaro had

7    either filed a complaint and he would write in the

8    logbook about the conditions there, and so -- the

9    conditions in the pre-release department, and that

10   that's why the department wouldn't have been a good

11   place for me to work.

12       Q.    Okay.  When you spoke with Pamela Mercer, you

13   mentioned it was after you were assigned to the

14   pre-release center.  That -- That's correct?

15       A.    Yes, sir.

16       Q.    Okay.  And you were only at the pre-release

17   center for three days, correct?

18       A.    That's correct, sir.

19       Q.    Okay.  So was it within one of those three

20   days?

21       MR. TOWNSEL:  I'm sorry.  What was the question?

22       MR. GOLDEN:  You can read the question.

23                    (Record read as requested.)

24       MR. TOWNSEL:  "It" being the conversation?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 190

1   level personnel at the Sheriff's Office?

2        A.    Yes, I did.

3        Q.    Who?  To who -- To whom?

4        A.    John Harrington.

5        Q.    And what did -- When did you complain to John

6   Harrington?

7        A.    It may have been sometime during 2010 or

8   2009.

9        Q.    Can you be -- Excuse me.

10             2009 or 2010?

11       A.    I believe sometime during 2009, maybe the end

12  of the year, around November or December.

13       Q.    How did you complain to him?

14       A.    Via a grievance.

15       Q.    A union grievance?

16       A.    Yes, sir.

17       Q.    And what union were you a member of?

18       A.    AFSCME.

19       Q.    Are you currently an AFSCME member?

20       A.    Yes, sir.

21       Q.    Okay.  Do you hold a position with AFSCME?

22  Do you hold a position as a union steward, for

23  instance?

24       A.    No, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 191

1      Q.   Okay.  At the time, did you?

2      A.   No, sir.

3      Q.   Okay.  And so you filed a grievance through

4  the union with regard to the -- this is with regard to

5  the quality of the track?

6      A.   Yes.

7      Q.   Okay.  And what -- Did you speak to John

8  Harrington or just filed a grievance?

9      A.   I can't recall if I spoke to him.

10     Q.   Okay.  What did you say in your grievance?

11     A.   One of the things that was asked was to be

12  compensated for taking a physical -- a mandatory

13  physical fitness test twice a year to hold those

14  positions in the boot camp, and then the quality of the

15  track, that it was not consistent with training that we

16  received through the Cooper's Institute as physical

17  fitness instructors.

18     Q.   Okay.  And do you know whether this grievance

19  went to arbitration?

20     A.   I believe it did, sir.

21     Q.   Okay.  And was that the grievance that went

22  before an arbitrator named Edwin Ben?

23     A.   The name sounds familiar.

24     Q.   Were you present during the arbitration

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 192

1   hearing?

2        A.   I don't recall, sir.

3        Q.   And just to clarify, you complained about the

4   quality of the track, but you were also complaining

5   about the physical fitness test requirement?

6        A.   Yes, sir.

7        Q.   Okay.  This is the same grievance?

8        A.   Yes, sir.

9        Q.   Okay.  Do you recall whether the union lost

10  that grievance, whether it was denied or granted by the

11  arbitrator?  I should clarify.

12       A.   I want to say yes.  It was lost.  I want to

13  say yes.

14       Q.   So the grievance was denied?

15       A.   Yes, I believe so.

16       Q.   Meaning you had to take the -- The arbitrator

17  ruled that you could be required to take the physical

18  fitness test?

19       A.   Yes.

20       Q.   Okay.  And just for completeness, what was

21  your complaint -- What was the aspect of your complaint

22  with regard to having to take the physical fitness

23  test?  What were you complaining of in that part of the

24  grievance?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 193

1      **A.**   That no other entity had to take a physical

2   fitness test to hold their job in a specialized unit,

3   so -- such as the ERT or SORT.  They didn't have to

4   take a test just to remain in that position.  We were

5   mandated to take it twice a year just to hold a

6   position at the boot camp without any type of

7   compensation or any stipends or anything.

8      **Q.**   So you wanted compensation if you had to take

9   the physical fitness test?  Is that the issue?

10     **A.**   Yes.

11     **Q.**   Okay.  And when you say no other entity was

12  mandated, by "entity," do you mean no other

13  correctional sergeants?

14     **A.**   Specialized units.

15     **Q.**   Specialized units.  Okay.

16          And to that point, you had been taking a

17  physical fitness test twice per year?

18     **A.**   Yes, sir.

19     **Q.**   Okay.  And was that a requirement of being

20  assigned to the boot camp?

21     **A.**   Yes.

22     **Q.**   Okay.  And was that a requirement of being

23  assigned to the boot camp since you had been at the

24  boot camp?

Dionne Santos-Means v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 194

1     A.    Yes.

2     Q.    And that includes even your time as a drill

3     instructor, correct?

4     A.    Yes.

5     Q.    Okay.  And had you always taken the physical

6     fitness test?

7     A.    Yes.

8     Q.    And that would have been from 1996 through --

9     was it 2010?

10    A.    Yes, sir.

11    Q.    Okay.  And the test was conducted on the

12    track that we've been talking about?

13    A.    Yes.

14    Q.    And I believe you indicated previously in

15    this deposition that the test was given around April

16    and October of each year?

17    A.    Yes, sir.

18    Q.    Okay.  And what happened if you didn't -- Did

19    you always -- Excuse me.

20          Did you always pass the test when you took

21    it?

22    A.    I always passed the test.

23    Q.    Okay.  Do you know what would happen if you

24    didn't past the test?

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 207

1      Q.    Okay.   What did you talk about?

2      A.    I talked about how we had to perform that

3  test twice a year, no compensation; there were

4  individuals failing the test and still allowed to stay.

5  And I don't know if I said the condition of the track.

6      Q.    I believe you did.

7            Did you discuss any other issues you had

8  either concerning the condition of the track or the

9  physical fitness requirement with John DiNicola?

10     A.    And pay.

11     Q.    Okay.   Was this one conversation?   Was it

12  multiple conversations?

13     A.    Probably several conversations.

14     Q.    Okay.   Do you recall about when those

15  conversations occurred?

16     A.    No, I don't recall.

17     Q.    Do you recall the conversations individually?

18     A.    No, I don't.

19     Q.    Okay.   In your complaint, in Paragraph 17,

20  you indicate that you asked to take the test -- the

21  physical fitness test indoors because of your

22  disability.   Is that an accurate statement?

23     A.    Is that an inaccurate?

24     Q.    Is that accurate, what I just said?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 208

1    **A.**   Yes, sir.

2    **Q.**   Okay.  First, as to disability, did you mean

3    sarcoidosis, asthma, bronchial asthma, or all of the

4    above?

5    **A.**   All of the above.

6    **Q.**   Okay.  And why did you ask to take the

7    physical fitness test indoors?

8    **A.**   Because during the time we would take the

9    test, which is in the month of April and October, it

10   was cold; it was rainy; and I couldn't run and inhale

11   that air at the same time.

12   **Q.**   Okay.  And who did you make this request of?

13   Who did you ask that you be allowed to take the test

14   indoors?

15   **A.**   I first asked John Harrington --

16   **Q.**   When --

17   **A.**   -- as an accommodation.

18   **Q.**   My apologies.

19        You said "as an accommodation"?

20   **A.**   Yes, sir.

21   **Q.**   When did you ask John Harrington for this

22   accommodation?

23   **A.**   I believe it was around November 2010,

24   earlier November.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 209

1     Q.   And what specifically did you say to him?

2     A.   I went into Mr. Harrington's office, and I

3  explained to him the conditions of my illness.  And I

4  presented him with the letter and asked him if I could,

5  in accordance with my doctor, take the physical fitness

6  test indoors as opposed to outside.

7     Q.   And what doctor was that?

8     A.   Dr. Assefa.

9     Q.   Okay.  And what did Mr. Harrington say in

10  response, if anything?

11     A.   I believe he said he would review it or --

12  and get back with me.

13     Q.   Okay.  Did he tell you no?

14     A.   He didn't say no.

15     Q.   Okay.  And you said this was about early

16  2010?

17     A.   Late.

18     Q.   Excuse me.  Late.  I apologize.

19          November of 2010?

20     A.   I believe so, in that area.

21     Q.   Okay.  And did -- Do you remember saying

22  anything else to Mr. Harrington about this issue?

23     A.   No, not at the time.

24     Q.   Do you recall him saying anything else to

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 211

1    breath, and I was grasping for air really, really bad.

2        Q.   Okay.  And that was the basis for his

3    recommendation?

4        A.   Yes, sir.

5        Q.   Okay.

6        MR. TOWNSEL:  Object to form.

7              You already answered.

8    BY MR. GOLDEN:

9        Q.   And you discussed this with him, the doctor?

10       A.   Yes, sir.

11       Q.   Okay.  And when you talked to John

12   Harrington, he said he would look into it?

13       A.   I believe John Harrington stated that he

14   would have to forward that to Director Nolan.

15       Q.   Okay.  Did you ever receive any communication

16   from Director Nolan as a result of your request made to

17   John Harrington?

18       A.   Yes, I did.

19       Q.   Okay.  And what did you receive?

20       A.   I received a letter from Director Nolan.

21       Q.   Do you recall when you received the letter?

22       A.   I believe it was sometime in November

23   of 2010.

24       Q.   Okay.  Do you remember what the letter said?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 212

1      **A.**   It stated that -- something to the effect

2    that it has been advised that I perform my physical

3    fitness test indoors.  She asked for a medical

4    diagnosis or comprehensive medical documentation from

5    my physician; also, if I'm asking to be accommodated

6    under the Americans with Disability Act, state whether

7    it's permanent or not; and a list of restrictions, I

8    believe the letter stated.

9      **Q.**   Okay.  Did you only receive this letter from

10   Director Nolan, or did you also talk to Director Nolan?

11     **A.**   I believe it was just a letter.

12     **Q.**   Okay.  Would you agree that the letter didn't

13   say -- Did you have something to add, ma'am?

14     **A.**   No.

15     **Q.**   Would you agree that the letter didn't

16   indicate that you couldn't take the test indoors?

17     **A.**   It didn't say whether I could or could not.

18     **Q.**   Okay.  I'm going to ask that the court

19   reporter mark as Defendant's Exhibit 3 a document, and

20   I'm going to ask you to review the document, Sergeant

21   Santos-Means.  When you've had a chance to review it,

22   if you could just indicate to me.

23                      (Defendant's Exhibit No. 3 marked

24                       as requested.)

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 213

1   BY MR. GOLDEN:

2       Q.   Would you agree that this is a copy of the

3   letter that you received from Director Nolan that we

4   were discussing?

5       A.   It appears to be.

6       Q.   Okay.  Is this a true and accurate copy of

7   that letter?

8       A.   It appears to be.

9       Q.   Okay.  Do you have any reason to believe that

10  it's not a true and accurate copy?

11      A.   No, sir.

12      Q.   Okay.  And what happened next?

13      A.   Next when?

14      Q.   Did you follow through with Director Nolan's

15  instructions?

16      A.   Director Nolan gave me a deadline of

17  November 22nd, 2010, to bring in the restrictions.  At

18  that time, my illness began to progress, and I couldn't

19  return to work.  I informed her that my illness had

20  began to progress and a doctor had me off of work at

21  that time.  I believe, through another correspondence,

22  she says, well, when I'm able to return to work, bring

23  in those documents that she's requesting in this

24  particular letter.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 214

1    Q.   Okay.  Did you speak to Director Nolan?

2    A.   I believe that I did, sir.

3    Q.   Okay.  And you communicated that you would

4  not be able to work?

5    A.   Yes, sir.

6    Q.   And that was due to an -- That was due to

7  your condition, sarcoidosis, correct?

8    A.   Yes, sir.

9    Q.   Okay.  Was that also due to your asthma or

10  bronchial asthma?

11    A.   I believe it was any related respiratory

12  problems that I was having at that time.

13    Q.   Okay.  And was this your doctor who had --

14  Was this Dr. Assefa who had recommended that you not

15  return to work?

16    A.   I believe at this time it was Dr. Tepeli.

17    Q.   Okay.  Do you remember what you specifically

18  said to Director Nolan when you spoke to her?

19    A.   I believe I told her that I was in receipt of

20  the letter and that my condition had began to

21  exacerbate.  I believe at this time, I was placed on

22  prednisone.  I believe at this time, I was placed on

23  prednisone.  And, per Dr. Tepeli, until the -- the

24  exacerbation had subsided, then I wouldn't be able to

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 215

1   return to work.

2       Q.   Okay.  I'm going to hand the court reporter

3   another document that I'm going to ask the court

4   reporter to mark as Defendant's Exhibit 4 and then hand

5   it to you for review and identification.

6                        (Defendant's Exhibit No. 4 marked

7                         as requested.)

8   BY MR. GOLDEN:

9       Q.   Okay.  Is this a copy of the letter that

10  Director Nolan sent to you after you spoke to her --

11  excuse me -- about having to go out on disability?

12      A.   Yes, sir.

13      Q.   Okay.  Is this a true and accurate copy of

14  that letter?

15      A.   It appears to be a true and accurate copy,

16  sir.

17      Q.   Okay.  Other than the handwritten notation,

18  perhaps, at the -- towards the top of the page?

19      A.   Yes, sir.

20      Q.   Okay.  Is that your handwriting?

21      A.   It's hard to say, sir.

22      Q.   Okay.  Do you recognize the handwriting?

23      A.   I can't ascertain whether that's mine or not.

24      Q.   And does this letter fairly represent the

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 218

1    drill sergeants as well.

2         Q.    Okay.  The same position as you?

3         A.    Yes, sir.

4         Q.    Were they on the same shift as you?

5         A.    Sergeant Boyd was.

6         Q.    Were there any other positions -- drill

7    sergeant positions at the boot camp that had different

8    responsibilities from what your responsibilities were

9    as a drill sergeant, or were -- all drill sergeants had

10   the same responsibilities?

11        A.    All had the same responsibilities.

12        Q.    Is there anything that we haven't discussed

13   today concerning your complaints about the condition of

14   the track and asking to take the physical fitness test

15   indoors?

16        MR. TOWNSEL:  Objection:  improper and overbroad.

17             Please answer if you can.

18   BY THE WITNESS:

19        A.    Upon returning to work, I asked Ms. Nolan

20   several times about being exempt from taking the

21   physical fitness test due to my medical condition.  I

22   was told that they weren't going to do that for me.  I

23   mentioned to her how there were two individuals,

24   Sergeant Boyd and Sergeant Scales themselves, who were

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 221

1      **A.**   That's correct, sir.

2      **Q.**   Okay.  And at that time, you attempted to

3    return to work?

4      **A.**   Yes, sir.

5      **Q.**   Okay.  Had you attempted to work before then?

6      **A.**   No, sir.

7      **Q.**   Okay.  How did you initiate attempting to

8    return to work?

9      **A.**   I went to my physician, got a clearance, made

10   an appointment with the Cook County medical division.

11   I was cleared from her, the doctor -- the medical

12   doctor.  And because I had restrictions, I had to

13   report to Director Nolan's office.

14     **Q.**   And that's the meeting that you're talking

15   about with Director Nolan?

16     **A.**   Yes, sir.

17     **Q.**   Okay.  And did you -- You said you received

18   clearance to return to work from your physician?

19     **A.**   Yes, I did.

20     **Q.**   Which physician was that?

21     **A.**   Dr. Tepeli.

22     **Q.**   Okay.  And what restrict- -- What, if any,

23   restriction -- Were you given any restrictions upon

24   returning to work by Dr. Tepeli?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 222

1      **A.**    Yes, I was.

2      **Q.**    Okay.  What were those restrictions?

3      **A.**    I believe some of the restrictions were to --

4   to avoid contact with inmates with airborne diseases,

5   not to run on the track with the rubber tire pellets,

6   to avoid extreme temperatures of hot and cold, to

7   avoid, I believe, chemicals and cigarette smoke, dust,

8   mold, I believe it mentioned.

9      **Q.**    Okay.  And after your conversation with

10  Director Nolan, what happened next?

11     **A.**    Because I didn't receive an -- an

12  accommodation -- they needed an accommodation specific

13  to my illness -- I ended up going back out on

14  disability.

15     **Q.**    Okay.  What positions -- Is it accurate to

16  say you believe that there were -- there were positions

17  that you could have filled that would have accommodated

18  your condition and restrictions?

19     **A.**    There were positions in the training academy

20  as a drill sergeant.  There was a position in the

21  records office.  And I could have worked back in the

22  boot camp had I been exempt or allowed to take the

23  physical fitness test indoors.

24     **Q.**    Were you -- You had mentioned requesting to

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 223

1   be exempted from the fitness test, but I don't believe

2   you mentioned requesting that you be allowed to take

3   the physical fitness test indoors.  You mentioned that

4   was a restriction, I believe, from your position.  Did

5   you actually make that request of Director Nolan?

6       A.    To be exempt or indoors?

7       Q.    To do it indoors.  To do the testing indoors.

8       A.    I meant the first -- very first time I was

9   trying to do my job.  But here, it was exempt.

10      Q.    Maybe I don't understand.

11            So when you came back -- or attempted to come

12  back in August of 2011, did you -- you spoke to

13  Director Nolan and indicated that, among other things,

14  you wanted to be exempted from the physical fitness

15  test; is that accurate?

16      A.    That's correct, sir.

17      Q.    Okay.  Did you -- And your testimony is that

18  Director Nolan told you that wasn't possible?

19      A.    She says, We're not going to do that for you.

20      Q.    Okay.  Did you -- And that she said she

21  offered that you could take a demotion or that you

22  could become a civilian and apply for a position; is

23  that accurate?

24      A.    That's correct.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 224

1    Q.   Okay.  Did you indicate to her that you would
2  be willing to take the physical fitness test indoors?
3    A.   No, sir.
4    Q.   Okay.  So that issue of taking the test
5  indoors was not discussed in August of 2011?
6    A.   That's correct, sir.
7    Q.   Okay.  And did you have any other
8  conversations with Director Nolan other than that
9  initial conversation that we just discussed?
10    A.   No.  But during that particular conversation,
11  she did offer me an option of working in the -- as an
12  officer in the interlock in a couple of the divisions,
13  I believe, 4, 6, and 8.
14    Q.   That would have been the scenario where you
15  took a demotion; is that accurate?
16    A.   Yes, sir.
17    Q.   Okay.  And you turned that down?
18    A.   Yes, sir.
19    Q.   And you also turned down the possibility of
20  becoming a civilian and attempting to apply for one of
21  those positions?
22    A.   Yes, sir.
23    Q.   Okay.  You mentioned that you believe you
24  could have -- you could have taken -- you could have

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 233

1        Q.    Yes.

2        A.    -- they were transferred out of the boot

3   camp.  So that wouldn't pose a problem for allowing me

4   to go back to the boot camp.  I also stated to her that

5   there was a memo in place for extreme temperatures,

6   that no activity would be conducted outdoors if -- that

7   being the case.  So that wouldn't pose a problem as me

8   returning back to the boot camp.

9        Q.    Okay.  Do you remember any other discussions

10  with Director Nolan?

11        MR. TOWNSEL:  Objection.

12            Please answer.

13  BY THE WITNESS:

14        A.    I had several conversations with Ms. Nolan.

15        Q.    In August of 2011?

16        A.    I don't remember the exact date of all the

17  conversations.

18        Q.    Relative to your attempting to return to duty

19  in 2011, did you have multiple conversations with

20  Director Nolan?

21        A.    I've had several conversations.  I don't know

22  how many to be exact.

23        Q.    Okay.  At that time?

24        A.    I believe the conversations occurred after I

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 234

1   was denied the accommodations.

2       Q.   Okay.  So you -- Well, you would agree that

3   you spoke to Rosemarie Nolan at least one time

4   before -- at least one time about open positions that

5   you could take either by taking a promotion or becoming

6   a civilian, correct?

7       A.   Can you repeat that, please?

8       Q.   Sure.

9            You said that you remember conversations

10  after you were denied, in your words, the

11  accommodation.  That's other than the conversation you

12  had where you discussed you -- taking a -- possibility

13  of -- you could take a demotion if you wanted or you

14  could take a civilian position if you wanted?

15      A.   That's correct.

16      Q.   Okay.  And were those additional

17  conversations with Director Nolan in 2012 when you

18  ultimately did come back, or was this all around --

19  were there multiple conversations still in 2011?

20      A.   I can't remember the time frame, sir.

21      Q.   Okay.  And you mentioned that inmates with

22  airborne diseases were transferred out of the boot

23  camp.  Can you explain what that means?

24      A.   Yes.  If an inmate was found to have maybe

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 237

1    that you were returning -- that you would have been

2    returning to work with?

3        A.    That's correct, sir.

4        Q.    And these were the restrictions that were

5    recommended by your physician, Dr. Tepeli?

6        A.    Yes, sir.

7        Q.    At that time?

8        A.    Yes.

9        Q.    Okay.  You can set the letter aside.

10            Before we move forward to the next period

11   where you went back on leave -- And let me just

12   confirm.  After that -- After that -- receiving that

13   letter, you ultimately went back on disability leave,

14   correct?

15       A.    Yes, sir.

16       Q.    Okay.  The first time you went on disability

17   leave, this is -- your condition was exacerbated in

18   November of 2010; do you recall that?

19       A.    Yes, sir.

20       Q.    Okay.  What I didn't ask was, what did you do

21   while you were on leave?

22       A.    Other than trying to get better?

23       Q.    Well, that -- That certainly -- Anything that

24   you can tell me about you -- Did you see your doctor?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 239

1     A.    There were periods when they were worse than

2     others.

3         Q.    Okay.  And what were your symptoms?

4     A.    Shortness of breath, cough, fatigue.

5         Q.    Any other symptoms you can recall?

6     A.    The shortness of breath, the tightness -- not

7     the tightness.  The shortness of breath, being

8     fatigued.  That's all I can think of at this time.

9         Q.    Okay.  And did you exercise during the time

10    that you were out beginning in November of 2010 and

11    continuing into August of 2011?

12    A.    I don't recall exercising during that period

13    of time.

14        Q.    Okay.  Then you went back on disability in

15    August of 2011 when you weren't able to assume another

16    position with the Sheriff's Office; is that right?

17    A.    Yes, sir.

18        Q.    Okay.  Before we talk about that period of

19    time, did you also -- in addition to Rosemarie Nolan,

20    did you also speak to an individual with the Sheriff's

21    Office named Finola Keegan?

22    A.    Yes, I did.

23        Q.    Okay.  And who is Finola Keegan?

24    A.    I believe she's like an assistant personnel

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 240

1    director.

2        Q.    Okay.  And do you remember when you spoke to

3    Ms. Keegan?

4        A.    I believe I spoke with her on the 5th.

5    August 5th, 2011, I believe I spoke with her then.

6        Q.    And please describe that conversation.

7        A.    At that time, I was hoping to return to work.

8    And Director Nolan was not in.  So I ended up speaking

9    with Finola -- with Keegan, giving her my letter for

10   the restrictions.  And she told me that Director Nolan

11   wasn't in at the time, that she would forward the

12   information to her.  And I believe Ms. Keegan forwarded

13   me a letter that looked similar to this.

14       Q.    I'm going to ask the court reporter to mark

15   as Exhibit -- Exhibit 6, a document.  And I'm going to

16   ask you to review it and state to me whether that's --

17   this is a copy of the letter that you just referred to.

18                        (Defendant's Exhibit No. 6 marked

19                         as requested.)

20   BY MR. GOLDEN:

21       Q.    Is that a copy that you were sent by Finola

22   Keegan following your meeting with her on August 5th,

23   2011?

24       A.    Yes, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 241

1      Q.    Okay.  And you received this letter?

2      A.    Yes, I did.

3      Q.    And is this a true and accurate copy of that
4   letter?

5      A.    Yes.

6      Q.    Okay.  You can set the letter aside.

7            Did you speak to anyone else at the Cook
8   County Sheriff's Office concerning your request for
9   accommodation in August of 2011 before you went on
10  disability other than Ms. Nolan and Ms. Keegan?

11     A.    Not that I can recall, sir.

12     Q.    Okay.  And did you speak to -- Other than
13  what we talked about as far as your union, did you
14  speak to anyone else at your union?

15     A.    No, not that I can recall.

16     Q.    Okay.  Do you recall speaking to any family
17  members about returning to work or attempts to return
18  to work in August of 2011?

19     A.    Other than my mother and my husband, no.

20     Q.    Okay.  Can you describe your conversation
21  with your mother?

22     A.    That I was hoping to return to work at that
23  particular time.

24     Q.    Anything else you can recall about that

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 244

1    Dr. Tepeli, what do you recall?

2        A.   I told him that I felt fine and I believed

3    that I could go back to work at that time.

4        Q.   Okay.  And what did Dr. Tepeli say?

5        A.   He examined me.  He felt the same.  So he

6    issued the letter with the restrictions.

7        Q.   Did you discuss those restrictions with him?

8        A.   Yes, I did.

9        Q.   Okay.  What do you recall about that

10   conversation?

11       A.   He asked me in what type of environment was I

12   working in -- did I work in and what could have -- what

13   things do I think would have an effect on my health.

14   And I told him.  And those were the restrictions that

15   he outlined for me.

16       Q.   Okay.  So the basis of Dr. Tepeli's

17   restrictions were the conversation he had with you?

18       MR. TOWNSEL:  Object to form.

19            Please answer.

20   BY THE WITNESS:

21       A.   Yes.

22       Q.   Okay.  Was this -- When you talked to

23   Dr. Tepeli about returning to work and he wrote this

24   letter, was this one conversation or multiple

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 249

1      Q.   So this was in August of 2012?

2      A.   I attempted to come back to work twice.

3      Q.   I understand.

4           The first time, I think we discussed, August

5  of 2011.

6      A.   Mm-hmm.

7      Q.   So the next time you came back to work, was

8  that August of 2012?

9      A.   Yes, sir.

10     Q.   Okay.  And talk to me about the process.  How

11 did you initiate attempting to return to work then?

12     A.   I again spoke with John DiNicola and Vernon

13 Brandon.  And at that time, John DiNicola wrote a

14 letter to Peter Kramer, I guess the County's attorney,

15 asking that I be reassigned back to the boot camp with

16 having an exemption for taking the physical fitness

17 test.  I don't know if Mr. Kramer ever answered because

18 I didn't get a response.  I believe that letter was

19 forwarded to Director Nolan.

20          I went to my doctor and got clearance.  I

21 then went down to the County's medical department to

22 get clearance from the medical -- from the doctor.

23 That was about -- I forget which day.  And then I take

24 it to -- I take it over to Director Nolan's office,

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 252

1    Sheriff's department did not accommodate sergeants

2    under the ADA Act.  He agreed.  And he said that that

3    was true, that the sheriff's department had given him

4    an accommodation.

5        Q.   Okay.  What was your understanding of those

6    circumstances?

7        A.   I don't know the nature of the person's

8    illness.  I just know he was assigned to Division 5

9    lobby or either the records department.

10       Q.   Okay.  Do you remember anything else of your

11   correspondence with John DiNicola?

12       A.   No.  Not offhand, I don't.

13       Q.   Did you only communicate with John DiNicola

14   by e-mail, or did you speak to him as well?

15       A.   I may have spoke with him as well.

16       Q.   Do you remember the context of the

17   conversation?

18       A.   No, sir.

19       Q.   Okay.  And had you seen your physician?  When

20   you were attempting to return to work in August of

21   2012, did you also talk to your physician, one of your

22   physicians?

23       A.   Yes, I did.

24       Q.   Okay.  Which physician?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 253

1      **A.**    I know for certain that I talked to

2   Dr. Tepeli.

3      **Q.**    Okay.  And describe what you talked about

4   with Dr. Tepeli.

5      **A.**    I told Dr. Tepeli that I was feeling well

6   enough to return to work.  He examined me, and he

7   agreed.  And he wrote a letter to return with the

8   restrictions on it.

9      **Q.**    And what were those restrictions?

10     **A.**    To avoid cigarette smoke, dust, I believe,

11  the rubber tire pellets, chemical sprays -- I believe

12  at that time the track was repaired, so I don't know if

13  he mentioned that -- contact with inmates.  And I

14  believe he may have mentioned the physical fitness test

15  as a restriction -- exemption.  I believe he put

16  "exemption" at that time.

17     **Q.**    Is it accurate to say that the restriction as

18  to contact with inmates involved wearing a mask?

19     **A.**    I'm sorry?

20     **Q.**    Did the contact with inmates -- was that

21  restriction concerning your being allowed to wear a

22  mask?

23     **A.**    Yes, sir.

24     **Q.**    Okay.  Which was different than that

Royal Reporting Services, Inc.
312.361.8851

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 254

1   restriction in August of 2012; is that accurate to say?

2       **A.**   Correct.  If I was to return to the boot

3   camp, he asked if I could wear a mask if I had to be

4   around inmates.

5       **Q.**   Okay.  So whereas, in 2011, it was to avoid

6   contact with inmates with tuberculosis or airborne

7   illnesses; in 2012, that restriction was to wear a mask

8   and -- to avoid that contact?

9       **A.**   Yes, sir.

10      **Q.**   Okay.  Do you remember anything else as far

11  as -- Did you discuss those restrictions with

12  Dr. Tepeli?

13      **A.**   Yes, I did.

14      **Q.**   And what do you remember from that

15  conversation?

16      **A.**   Well, not knowing if I would be able to

17  return to the boot camp, I believe that -- I believe

18  Dr. Tepeli gave me a restriction for no inmate contact.

19          I'm sorry.  It's been a long day.

20      MR. GOLDEN:  Do you need a break?

21      THE WITNESS:  May I, please?

22      THE VIDEOGRAPHER:  We're now going off the record

23  at 5:21 p.m.

24                  (A short break was had.)

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 257

1    was the 3rd of August 2012, in order to go to work on

2    the 6th of August 2012.  I was told that Director Nolan

3    was not in and that she would get back with me on

4    Monday.  If I may take that back.  I don't believe I

5    seen Sean Lynch at that time.  I forget who told me

6    that she wasn't in and that she would get in contact

7    with me Monday.  I believe it was Finola Keegan.

8              Monday, I waited to hear from Director Nolan.

9    She never called, which was the 6th, I believe.  I

10   called her Tuesday, left a message on her voicemail.

11   She never called.  Around August 15th or 14th, I

12   believe I received a call from Ms. Nolan stating that

13   they had a position available for me in the pre-release

14   department and that I can come down to the Sheriff's

15   Office.

16        Q.   So Ms. Nolan called you?

17        A.   Yes.

18        Q.   And she offered that position?

19        A.   Yes, sir.

20        Q.   And did you accept?

21        A.   Yes, sir.

22        Q.   Okay.  And what did she tell you about the

23   position?

24        A.   She said that she identified a position that

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 258

1  would accommodate my restrictions and illness at the

2  pre-release center.  And the only thing that she could

3  tell me is that the air quality control was maintained

4  by facilities management, but everything else was okay.

5       Q.   Did you discuss whether there was air

6  conditioning at the pre-release center?

7       A.   She stated to me that she didn't believe that

8  it had air conditioning but the air quality control

9  was, again, maintained by facilities management.

10      Q.   Okay.  And on that -- And what happened --

11 Excuse me.  What happened next?

12      A.   The next day, I go downtown.  I didn't see

13 her.  I then see Sean Lynch, who asked me how would I

14 cover my time off from August the 6th through the 15th.

15 And I asked him what did he mean, how I was going to

16 cover that time, when I, in fact, came down when I was

17 supposed to to go to work.  But she didn't -- Rosemarie

18 Nolan didn't contact me until approximately nine or ten

19 days later.

20           He says otherwise I'm considered to be an

21 unauthorized absent status.  And I told him that that

22 wasn't my fault because I came down to come to work or

23 go back to work, but she didn't get in touch with me.

24           I ended up -- He asked me to call my doctor

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 261

1    15th.  I had went down to find out where exactly I

2    would be working, and then I came to work the next day.

3         Q.    Okay.  I apologize.

4               And that -- Where was the pre-release

5    center -- Where was the pre-release center located?

6         A.    It was south campus, Buildings 3 and 4.

7         Q.    Okay.  And you went to work on the 17th?

8         A.    Yes, sir.

9         Q.    Okay.  And you worked there for three days?

10        A.    Yes, sir.

11        Q.    Okay.  What was your -- What were your --

12   What did you do during those three days?

13        A.    When I first reported to the pre-release

14   center, I was told a little bit about the program, that

15   it was a program where individuals were in a gateway

16   program being treated for drug addictions and it was

17   sort of like a program that ran itself, a structured

18   program.

19        Q.    And what were you to do there?

20        A.    I was assigned to sign the books on the

21   different floors to make sure that everything was

22   running smoothly without any problems, the safety and

23   security of the staff as well as the inmates.  So it

24   required signing the books, just making rounds to make

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 264

1    **A.**   I didn't get a chance to.

2    **Q.**   Okay.  And you said you experienced certain

3    symptoms that caused you to go to the hospital on the

4    third day?

5    **A.**   That's correct, sir.

6    **Q.**   Can you talk about what happened?

7    **A.**   Again, the second day, I started

8    experience -- developing this cough and producing a lot

9    of mucus.  The third day, I started to develop the

10   tightness in the chest.  After that third day of work,

11   I went to the emergency room the following day.  I was

12   diagnosed with pneumonia, and the sarcoidosis had

13   exacerbated again.

14   **Q.**   Did you spend the night in the hospital?

15   **A.**   I don't recall if it was an overnight stay.

16   **Q.**   Okay.  And is it accurate to say that in -- I

17   apologize.

18       Before we go there, did you come to -- This

19   was on the 19th, August 19th of 2012?

20   **A.**   Yes, sir.

21   **Q.**   Okay.  And thereafter, did you fill out any

22   sort of incident report related to your experience at

23   the pre-release center?

24   **A.**   Yes, I did, sir.

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 266

1       A.    Yes.

2       Q.    Okay.  You can put the document aside.

3             Is it accurate to say that Director Byrne

4   also filled out an incident report?

5       A.    Yes, sir.

6       Q.    And do you know what the incident reports

7   were used for?

8       A.    It was a part of the duty injury packet.

9       Q.    Okay.  Is that related to a workers'

10  compensation claim?

11      A.    Yes, I believe so.

12      Q.    Okay.  And is it your position or would you

13  believe it's your position in your complaint that you

14  believe that you were hospitalized as a result of the

15  conditions of the pre-release center?

16      A.    Yes, sir.

17      Q.    Okay.  And that those conditions caused you

18  to contract -- Is it your position that those

19  conditions caused you to contract pneumonia?

20      A.    Yes, sir.

21      Q.    Is it your -- also your position that those

22  conditions caused you to -- an exacerbation of your

23  sarcoidosis?

24      A.    Yes, sir.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 267

1    Q.   Okay.  Is it also your position that those

2    conditions affected your asthma or bronchial asthma?

3    A.   Yes, sir.

4    Q.   Okay.  And what is the basis for your opinion

5    that spending three days at the pre-release center

6    caused those injuries to you?

7    A.   The assignment that I was given to work, it

8    was in the chapel area where there were missing tiles

9    from the ceiling, water intrusion.  You could look up

10   in the ceiling and see the mold.  You could see the

11   dust everywhere, the mice droppings on the floor,

12   papers piled up by the -- the trash compactors.  The

13   place was deplorable, not -- not -- There was no proper

14   ventilation there.  All the things I experienced are

15   the things that have been determined to cause --

16   trigger asthma and to cause the sarcoidosis to

17   exacerbate.

18   Q.   Okay.  Is there any other basis for your

19   opinion that the conditions of the pre-release center

20   caused those health issues for you?

21   A.   Other than confirmation from the doctors

22   after I told them what type of environment I was

23   working in.  And I spoke with OSHA as well, and they

24   came out and did an investigation and found that the

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 272

1          MR. TOWNSEL:  Objection:  overbroad.

2                You can answer.

3     BY THE WITNESS:

4          A.    Other than what my coworkers were stating

5     about the conditions of the pre-release center, that

6     they -- that they had treated -- just recently treated

7     the place for asbestos and that it was still visible,

8     and the mold, that the coworkers confirmed the same

9     thing that I saw.

10         Q.    And you've told me here today -- You've told

11    us here today what your coworkers told you?

12         A.    Yes, sir.

13         Q.    And did you return to the pre-release center?

14         A.    No, sir.

15         Q.    Okay.  And did you go back out on disability?

16         A.    I went back out -- I guess, unauthorized duty

17    injury.

18         Q.    Okay.  And related to that, did you, around

19    that time, file any workers' compensation claims?

20         A.    Yes, I did.

21         Q.    Okay.  How many claims did you file?

22         A.    I believe, two.

23         Q.    And what was -- Were the claims the same, or

24    were they different claims?

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 274

1      MR. TOWNSEL:  I'm going to object to you

2  commenting anything about what the workers' comp

3  attorney told you.  You could just say that you had

4  conversations with the workers' comp attorney and your

5  understanding as to where you sit right now.

6          Please answer the question.

7  BY THE WITNESS:

8      A.   I just had conversations with her.  And I'm

9  not sure, actually, where we are as far as settling.

10      Q.   When you say "attorney," are you talking

11  about your attorney?

12      A.   I'm talking about my workers' compensation

13  attorney.

14      Q.   I understand.

15          But this would be your attorney?

16      A.   Yes.

17      Q.   Okay.  Not an attorney from my office, for

18  instance?

19      A.   No, sir.

20      Q.   Okay.  And did you return to work after being

21  out on that -- what you referred to as unauthorized

22  status?

23      A.   Yes.

24      Q.   Okay.  And, first of all, do you know why you

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means – Taken 7/24/2015

Page 275

1    were out on unauthorized status?

2        **A.**    Because, per the claims adjuster from risk

3    management, my condition didn't happen at work.

4        **Q.**    Okay.  Risk management, that's not a part of

5    the Cook County Sheriff's Office; is that accurate?

6        **A.**    No.  It is a part of Cook County Sheriff's

7    department.

8        **Q.**    Okay.  Is that risk management with Cook

9    County or the Cook County Sheriff's Office, if you

10   know?  Let me rephrase.

11            You believe the risk management department is

12   part of the Cook County Sheriff's Office?

13       **A.**    Represents the Cook County Sheriff's

14   department, yes.

15       **Q.**    Okay.  And based on that, did you not have

16   any time left to go out on disability, for instance?

17       **A.**    That's correct.

18       **Q.**    Okay.  And did you have any ability to go

19   on -- Had you had the ability to go on FMLA, if you

20   know?

21       **A.**    No.  The ability wasn't -- I could not have

22   gone on FMLA.

23       **Q.**    Okay.  Did you ever go on FMLA during your

24   time at the Cook County Sheriff's Office relating to

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 276

1   your condition of sarcoidosis?

2        A.    Upon returning back to work in 2013.

3        Q.    Okay.  And was that the next time after your

4   experience with the pre-release center that you

5   returned to work in 2013?

6        A.    Yes, sir.

7        Q.    Okay.  And how did you come back to work?

8        A.    I believe, the same procedure.  I -- I

9   believe I may have contacted Director Nolan, told her

10  that I was going to be released to come back to work,

11  went to the -- got medical clearance from my doctor,

12  went to the County's doctor, and spoke with Director

13  Nolan.

14            She identified two places that she thought

15  would be an accommodation for me.  She described one as

16  the new building, but then she stated that the building

17  hadn't settled and that individuals were claiming that

18  they were getting sick because of some flooding and

19  some water issues.  So she assigned me to the

20  visitation center.

21        Q.    What was the new building?  What was your

22  understanding of that position?

23        A.    I would have been a sergeant in, I believe,

24  classification.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 277

1      Q.   Okay.  And so you were offered the position

2    at the visitation center?

3      A.   I'm sorry?

4      Q.   You were offered a position and accepted a

5    position at the visitation center?

6      A.   Yes.

7      Q.   Okay.  And did you have restrictions at that

8    time?

9      A.   Yes, sir.

10     Q.   And was that Dr. Tepeli again who made those

11   restrictions?

12     A.   Yes, sir.

13     Q.   And what were those restrictions?

14     A.   To avoid dust, chemical sprays, OC pepper

15   spray, inmates with airborne diseases.  I believe -- I

16   believe it was no inmate contact at that time -- at

17   this particular time.  Oh, access to fresh air --

18   Access to open windows, fresh air, and being able to

19   step outside, I believe.

20     Q.   And are any of your claims in this lawsuit

21   related to your time at the visitation center?

22     MR. TOWNSEL:  I'll object to the extent that it

23   seeks a response inconsistent with what's already been

24   filed with the court.

Dionne Santos-Means  v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 278

1          Please answer the question.

2     BY THE WITNESS:

3          **A.**   I don't recall if any of them are for the

4     visitation center.

5          **Q.**   Okay.  Are you -- Are you claiming that the

6     Sheriff's Office failed to accommodate you in placing

7     you at the visitation center?

8          **A.**   I'm sorry?

9          **Q.**   Are you claiming that the Sheriff's Office

10    failed to accommodate you in placing you at the

11    visitation center?

12         **A.**   No, I'm not claiming that.

13         **Q.**   Okay.  Are you claiming that the Cook County

14    Sheriff's Office retaliated against you for exercising

15    your rights under the ADA by placing you at the

16    visitation center?

17         **A.**   Can you repeat that again, please?

18         **Q.**   Yes.

19              You would agree that your -- part of your

20    claim is a -- You have a retaliation claim in your

21    complaint; would you agree with that?

22         **A.**   Yes, sir.

23         **Q.**   Okay.  And you believe the -- Your position

24    is, the Sheriff's Office retaliated against you for

Dionne Santos-Means   v. Sheriff's Office of Cook County
Deposition of Dionne Santos-Means - Taken 7/24/2015

Page 279

1    exercising your rights under the ADA; is that accurate?

2        A.   Yes.

3        Q.   Is being -- Is accepting -- Being offered and

4    accepting a position at the visitation center, is that

5    in any way related to your claims of retaliation?

6        A.   No, I don't believe so.

7        Q.   Okay.  And what was your position at the

8    visitation center, just for the record?

9        A.   Just a correctional sergeant.

10       Q.   Okay.  And how long were you there?

11       A.   December 2013 to about November 2014.

12       Q.   Did you have any issues with your sarcoidosis

13   during that time?

14       A.   No, not sarcoidosis.

15       Q.   Did you have any issues with your asthma

16   during that time, either bronchial or I suppose what

17   we'll call normal asthma?

18       A.   Yes.

19       Q.   And was that a result of being at the

20   visitation center?

21       A.   Yes, it was.

22       Q.   How so?

23       A.   On one occasion, the custodian was vacuuming

24   the carpet, and there were just airborne particles