Dionne Santos-Means v. Sheriff's Office of Cook County, Illinois

12 C 8804

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| DIONNE SANTOS-MEANS, | ) |
| Plaintiff, | ) |
| -vs- | ) No. 12 C 8804 |
| SHERIFF'S OFFICE OF COOK COUNTY, | ) |
| Defendant. | ) |

Discovery deposition of JOHN HARRINGTON, called for examination, taken before Cynthia L. Nylec, CSR and Notary Public, pursuant to the Federal Rules of Civil Procedure of the United States District Courts, pertaining to the taking of depositions for the purpose of discovery, at the Townsel Law Firm, 715 East Golf Road, Suite 205, Schaumburg, Illinois, commencing at the hour of 10:00 o'clock a.m. on the 29th day of July, A.D. 2015.

```
 1    APPEARANCES:

 2

 3              TOWNSEL LAW FIRM

 4              BY:  MR. ANDRE E. TOWNSEL

 5              715 East Golf Road

 6              Schaumburg, Illinois   60173

 7              312.772.5850

 8                 on behalf of the Plaintiff;

 9

10              STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS

11              BY:  MR. SCOTT A. GOLDEN,

12              Assistant State's Attorney

13              50 West Washington

14              Chicago, Illinois   60602

15              312.603.1902

16                 on behalf of the Defendant.

17

18

19

20

21

22

23

24
```

Page 3

```
 1                    I N D E X
 2   WITNESS                        EXAMINATION
 3   JOHN HARRINGTON
 4        By Mr. Townsel            4, 129
 5        By Mr. Golden             122
 6
 7
 8
 9                   E X H I B I T S
10   NUMBER                         MARKED FOR ID
11   HARRINGTON DEPOSITION EXHIBIT
12        No. 1                     19
13        No. 2                     36
14        No. 3                     44
15        No. 5                     50
16        No. 6                     67
17        No. 7                     71
18        No. 8                     81
19        No. 9                     86
20        No. 10                    95
21        No. 11                    98
22
23
24
```

Page 6

```
 1      A.    I can't think of any reason.
 2      Q.    Great.  Do you know the Plaintiff,
 3   Dionne Santos-Means?
 4      A.    Yes.
 5      Q.    How do you know her?
 6      A.    I know her from having been assigned to
 7   the Cook County Sheriff's boot camp.
 8      Q.    And what --
 9      A.    At the --
10      Q.    I'm sorry.
11      A.    At the time, I was the director.
12      Q.    What is your current position?
13      A.    I am director of attendance review.
14      Q.    And is that in a different department
15   than the boot camp?
16      A.    Yes, it is.
17      Q.    Director of attendance review, what
18   department or division is that in?
19      A.    It's a branch currently of the human
20   resources department.
21      Q.    Okay.  And that's still for the
22   Cook County Sheriff's Office, correct?
23      A.    Yes, sir.
24      Q.    What's your current residence address?
```

Case: 1:12-cv-08804 Document #: 72-5 Filed: 03/31/16 Page 6 of 15 PageID #:391

Page 11

1  Commander Chubb, C-H-U-B-B, and Commander Consolino.
2  I believe he was a commander by then or captain.
3     Q.  And in terms of the hierarchy in the
4  Sheriff's Office, the lieutenants reported to the
5  captains?
6     A.  In chain of command, that's correct.
7     Q.  And the sergeants reported to the
8  lieutenants?
9     A.  Yes, sir.
10    Q.  And the sworn officers reported to the
11 sergeants?
12    A.  That's correct.
13    Q.  Okay. Could you tell me what your duties
14 and responsibilities were as director of the boot
15 camp for the Cook County Sheriff's Office?
16    A.  Sure. I oversaw the daily activities of
17 the alternative sentencing program for adult male
18 offenders between the ages of 17 and 35.
19        I supervised approximately 20 civilian
20 staff, roughly 60 drill instructors, roughly 6
21 sergeants and I'd speculate -- I believe at the time
22 I had 3 captains. Consolino may not have been
23 appointed a captain at that point because we are
24 going back to 2009, correct?

1   accomodation is to tell the personnel department?
2       A.   Yes, sir.
3       Q.   Do you have the authority to provide an
4   accommodation of any subordinate?
5       A.   No, sir.
6       Q.   How do you know that?
7       A.   Number one, I don't have the knowledge.
8   I'm not a human resource professional, nor am I a
9   lawyer.
10      Q.   And it's your understanding that only the
11  personnel department or their designee is responsible
12  for understanding the ADA Accomodation Procedure for
13  the Sheriff's Office?
14      MR. GOLDEN:   Objection, form.
15           You can answer.
16  BY THE WITNESS:
17      A.   Understanding it?  Perhaps no.  Making
18  the decision to accommodate?  Yes.
19  BY MR. TOWNSEL:
20      Q.   Okay.  And again, you have stated very
21  certainly that you don't have the authority to make
22  an accommodation.  And I think you have just said
23  that the personnel department has that authority.
24           Where do you get that understanding from?

Page 36

1  talking about with the track, did she ever just come
2  to you one-on-one or by phone and say, "Hey, I've got
3  an issue" --
4           MR. GOLDEN:  Objection -- excuse me.  Go ahead.
5  BY MR. TOWNSEL:
6      Q.   -- related to her medical condition?
7      A.   I don't remember.
8      Q.   Did you ever have any conversations with
9  the director of personnel concerning Ms. Santos-Means
10 and her medical condition?
11     A.   I don't remember.
12     Q.   Okay.  I'd like to show you what we are
13 marking as Harrington 2.
14                    (Document marked as
15                     Exhibit No. 2.)
16 BY MR. TOWNSEL:
17     Q.   Can you take a look at that document,
18 please?
19     A.   Okay.  I have read the document.
20     Q.   Okay.  Have you seen this document
21 before?
22     A.   I don't recall having seen it now that I
23 viewed it.  I may have read it previous.  I don't
24 dispute having received it.

1    Q.    What is it?

2    A.    It appears to be by title a Service Request Summary Report in regards to smoking.

4    Q.    And could you describe -- I don't know if it's called the gatehouse or whatever the front of this boot camp facility is. Would you just describe for the record as best you can?

8    A.    Sure. Once again, there's one entranceway and one exit to the boot camp on Rockwell Avenue. The boot camp entrance was -- there were I believe four or five steps leading into the entranceway.

And slightly just south to those steps to the door was a wheelchair ramp. And that was the main entrance to that post which we referred to as the front gate.

17    Q.    Does this refresh your recollection at all that perhaps Ms. Santos-Means brought to your attention in November of 2009 a complaint about smoking at the gatehouse?

21    A.    Yes. It does refresh my memory.

22    Q.    Okay.

23    A.    I just want to say for the record I'm not sure if it was brought to my attention by

1    Q.    Who is Captain Pankiewicz?

2    A.    Captain Pankiewicz was the daytime
3 commander on duty for the dayshift, which is
4 5:30 a.m. to 1:30 p.m., at least during the time I
5 believe Sergeant Santos to have been assigned there.

6    Q.    Do you know whether you ever spoke with
7 Captain Pankiewicz concerning Ms. Santos-Means'
8 smoking complaint?

9    A.    I don't remember who it was I had a
10 conversation with.  I do know I took an action on
11 this matter.

12    Q.    You say you took an action on the matter.
13 What action did you take?

14    A.    I believe I contacted Facilities
15 Management, and I believe the wheelchair ramp was
16 typically the smoking area that was used by boot camp
17 staff.

18    I can't remember if we either chalked or
19 spray painted an area on that ramp requiring people
20 to smoke in that area and restrict their smoking to
21 that area.  I believe I may have generated a
22 memorandum, as well.

23    Q.    So --

24    A.    Oh, one more thing.

Page 38

1   Ms. Santos-Means or my commander or somebody else.
2   But I do recall that she had an issue with secondhand
3   smoke at the gatehouse.
4       Q.   So as you sit here today, you don't have
5   a specific recollection of speaking with
6   Ms. Santos-Means about this issue?
7       A.   I do not. I don't recall. I don't
8   remember.
9       Q.   But do you have any reason to dispute
10  that you may have and just don't recall?
11      MR. GOLDEN: Objection, speculation.
12          You can answer.
13  BY THE WITNESS:
14      A.   I don't have any reason to dispute it.
15  BY MR. TOWNSEL:
16      Q.   So do you have a specific recollection of
17  any content of a discussion, regardless of -- with
18  Ms. Santos-Means?
19      A.   Once again, I don't have a memory of
20  having a conversation with Santos-Means specifically
21  about this subject. This subject was brought to my
22  attention. It may have been through Santos-Means
23  directly. It may have been through my commander. It
24  may have been through this document.

Page 40

1  Q. Sure.
2  A. I don't recall how I came across them,
3  but I had laminate postings of No Smoking. I don't
4  know if it came from -- I don't recall where I got
5  them from.
6  Q. And what did you do with those laminate
7  postings?
8  A. I posted them.
9  Q. Was this at the entranceway? Where was
10 this?
11 A. I believe I posted them in the
12 entranceway.
13 Q. Do you know by chance whether they are
14 still there?
15 A. I don't know.
16 Q. So you said in connection with exhibit 2
17 that you took an action to provide some sort of
18 marking that designated smoking, is that right?
19 A. Yes.
20 Q. It is your understanding that prior to
21 that, most of the staff smoked by the wheelchair
22 ramp?
23 A. That's correct.
24 Q. Did you personally observe this when you

1  A. At that time, Rose Marie Nolan.

2  Q. Do you have a specific recollection of
3 having spoken with Rose Marie Nolan sometime in
4 November, 2010 about Ms. Dionne Santos-Means' medical
5 condition?

6  A. I don't have a specific recollection of
7 the date you just mentioned, having a conversation
8 about Santos-Means. I do recall having a
9 conversation with Rose Marie Nolan about
10 Santos-Means, but I don't recall the specific dates.

11  Q. Okay. Where was that meeting? Did that
12 discussion take place?

13  A. It could have been an e-mail
14 correspondence. It could have been a phone
15 conversation. It was not a face-to-face
16 conversation.

17  Q. Okay. What was the subject of it?

18  A. I don't recall specifically what the
19 subject was.

20  Q. If you don't know what the subject was,
21 how do you know that you spoke with Ms. Nolan about
22 Ms. Santos' medical condition?

23  A. Well, you said I spoke with her with
24 regard to the medical condition just now. I didn't

1   document.

2   BY MR. TOWNSEL:

3       Q.   Sure.  Did you ever discuss this letter
4   with Ms. Santos-Means?

5       A.   I don't remember.

6       Q.   So as far as you know, you never engaged
7   in a back-and-forth discussion with her about this?

8       A.   I don't remember.

9       Q.   Did you discuss this letter or the
10  contents of it with any other person other than
11  Ms. Santos-Means?

12      A.   I don't remember.

13      Q.   Do you understand that it would have been
14  your responsibility to have discussed this memo or
15  letter with someone, either your superior or --
16  strike that.

17           Do you know whether your role as director
18  required you to discuss this letter with anyone?

19      A.   Yes.  I would have corresponded with
20  somebody.  More than likely I would have corresponded
21  with someone in personnel if I received this
22  memorandum.

23      Q.   Okay.  And who was over in personnel at
24  the time?

Page 44

1  personnel department at all concerning the smoking
2  notice that we have marked exhibit 2?
3      A.   I don't remember.
4      Q.   Okay.  As director of the boot camp,
5  would you agree that it is ultimately your
6  responsibility to not only know the rules that apply
7  to your facility but to insure as best you can that
8  they're enforced?
9      A.   Yes.
10     Q.   At the very bottom of this exhibit 2, it
11 says that the notice was sent to you it looks like
12 around December 28.  Do you see that?
13     A.   Yes, sir.
14     Q.   Do you have any reason to believe that's
15 false?
16     MR. GOLDEN:  Objection, speculation,
17 foundation, form.
18          However, you can answer.
19 BY THE WITNESS:
20     A.   I don't dispute having received this.
21 BY MR. TOWNSEL:
22     Q.   Okay.  I'd like to mark this as
23 Harrington 3.
24                    (Document was marked