UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIONNE SANTOS-MEANS,<br><br>       Plaintiff,<br><br>   v.<br><br>SHERIFF'S OFFICE OF COOK COUNTY,<br>ILLINOIS,<br><br>       Defendant. | No. 12 CV 8804<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Dionne Santos-Means was a Drill Sergeant assigned to the Cook County Sheriff's Office's Boot Camp. She asked for various workplace accommodations for her respiratory disease, but in the end, those requests did not work out, and she brings claims for discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12112, 12203(a). The Sheriff's Office moves for summary judgment on both claims. For the following reasons, the Sheriff's Office motion for summary judgment is granted.

**I.    Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Justifiable inferences are drawn in the nonmovant's favor, *id.* at 255, and the party

seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**II.  Background**

Dionne Santos-Means started working for the Cook County Sheriff's Office in 1993, and she became a Drill Sergeant at the Boot Camp in 2004. [77] ¶¶ 1, 7.[1] The Boot Camp is an alternative sentencing program for young-adult, male, non-violent offenders and requires inmates to attend classes and participate in a rigorous exercise program. [77] ¶ 2. Drill Sergeants supervise the daily activities of Drill Instructors, exercise and march with inmates and Drill Instructors, assist in emergency situations, and assume Drill Instructor duties in case of a staff shortage. [77] ¶ 9. Like Drill Instructors, Drill Sergeants were required to pass a bi-annual physical fitness test consisting of a 1.5 mile run on an outdoor track, push-ups, and sit-ups. [77] ¶¶ 11, 25. There is evidence, however, that two Drill Sergeants retained their positions without passing the fitness test. [77] ¶ 11; [89] ¶ 8.

---

[1] Bracketed numbers refer to entries on the district court docket. Santos-Means's response to the Sheriff's Office's LR 56.1 statement—containing both the asserted fact and the response—is [77], and [89] is the Sheriff's Office's response to her LR 56.1 statement of additional facts. In responding to the Sheriff's Office LR 56.1 statements of fact, in many instances, Santos-Means's denials are argumentative, overbroad (in that they concern only one aspect of a given factual statement), or cite record evidence that does not properly controvert the factual statement. The purpose of Local Rule 56.1 is to permit the district court to identify at summary judgment which material facts are in dispute. The parties' Rule 56.1 statements and responses are viewed with this principle in mind. Unless otherwise noted, the facts related below are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by local rule. The Sheriff's Office filed a "reply" to Santos-Means's responses to its LR 56.1 statement, [87], but such replies are not contemplated by Rule 56.1. *See* LR 56.1(a) (permitting reply only in response to opposing party's statement of additional material facts). The reply is not considered.

2

In 2008, Santos-Means was diagnosed with sarcoidosis, a disease with no known cause that affects a patient's lungs and results in significant respiratory issues. [77] ¶¶ 13–14. Santos-Means was exposed to cigarette smoke when other employees smoked near the entryway of the Boot Camp. [77] ¶ 15. She told them that smoke affected her medical condition and that they should smoke 15 feet away from the building. [77] ¶¶ 16–17. She also asked one of the Boot Camp captains to announce during daily roll call that smoking near the entryway was banned; the announcement was made at the next roll call. [77] ¶ 17. Shortly thereafter, Santos-Means informed the director of the Boot Camp that she had a lung disease and that the smoke was affecting her. The director advised her that he would look into the matter. [77] ¶ 18. He had lines drawn around the outside of the Boot Camp entranceway to indicate restricted areas for smoking, and he also posted laminated no smoking signs nearby. [77] ¶ 20. Within weeks of Santos-Means's complaints, the director issued a memorandum to all Boot Camp staff designating the restricted area where smoking was permitted, and the memorandum was read at five consecutive roll calls. [77] ¶ 21. Santos-Means, however, testified that employees would still smoke near the entryway, although they would move aside when they saw her coming; she did not discuss this issue with the Boot Camp director. [77] ¶¶ 18, 22; [89] ¶ 4.

In 2010, Santos-Means delivered a doctor's letter to the Boot Camp director, which stated that Santos-Means should be permitted to perform the fitness test indoors because of her medical condition. [77] ¶ 26. The director did not reject her

request and advised her that he would look into the matter. [77] ¶¶ 26–27, 29. He did not have authority to grant a request for accommodation; only the Personnel Office of the Sheriff's Office had that authority. [77] ¶ 26; [89] ¶ 13. On November 8, 2010, the personnel director advised Santos-Means to report to the medical unit with a "comprehensive diagnostic medical statement from your physician, identifying your restrictions" no later than November 22, 2010. [77] ¶ 29. Santos-Means admits that this was not a rejection of her request to take the fitness test indoors. [77] ¶ 29. She did not report to the medical unit, and instead on November 17, 2010, she advised the personnel director that her medical condition had worsened and that she needed to be absent for an extended period. [77] ¶ 30. Santos-Means took FMLA and ordinary disability leave from the Sheriff's Office. [77] ¶ 31.

The following summer, another doctor sent the Sheriff's Office a letter advising that Santos-Means could return to work on August 8, 2011, with the following restrictions: avoid (1) cigarette smoke, dust, fumes, chemical sprays; (2) exposure/running on a recycled tire track; (3) contact with inmates with tuberculosis or other airborne diseases; and (4) extreme temperatures. [77] ¶ 32. The doctor's letter warned that Santos-Means had a lifelong respiratory illness and that failure to adhere to these restrictions would exacerbate her asthma and sarcoidosis and could lead to "hospitalization and/or death." [77] ¶¶ 33–34. Another restriction stated that Santos-Means should be permitted to perform the fitness test

4

indoors (and not on the outdoor recycled tire track), but she was actually seeking to be exempted from the fitness test altogether. [77] ¶ 36.

The personnel director was responsible for handling accommodation requests and ultimately responsible for determining whether a request for accommodation could be granted. [77] ¶ 39; [89] ¶ 13. The personnel director advised Santos-Means that, due to her restrictions, she was unable to perform the essential functions of a Drill Sergeant or Correctional Sergeant. [77] ¶ 40. According to the personnel director, the position of Drill Sergeant was incompatible with the restriction from contact with inmates with airborne diseases. [77] ¶ 41; [78] at 105–10. Because inmates with known diseases are removed from the general inmate population ([77] ¶ 41; [89] ¶ 22), Santos-Means argues that inmate contact would not have been a problem. According to Santos-Means, she was told that the fitness test was an essential function of the Drill Sergeant position and that she would not be exempted from the requirement, even though she knew of others who were exempted from it. [89] ¶¶ 7–8.[2]

The personnel director then identified ADA-designated Correctional Officer positions meeting Santos-Means's restrictions, namely, positions locked in an enclosed room within the Department of Corrections compound, which had no direct contact with detainees and limited contact with other employees. [77] ¶ 42. These

---

[2] Santos-Means disputes that they discussed the inmate contact restriction, but she does not cite controverting evidence in the record. She cites only the personnel director's testimony that she could not recall details regarding options discussed during their meeting and cites to "Declaration of Dionne Santos means." But no declaration was included with the summary judgment materials, and the supposed declaration is not cited elsewhere.

interlock positions were for Correctional Officers, not Correctional (or Drill) Sergeants, and would have required Santos-Means to accept a reduction in rank. [77] ¶ 43; [89] ¶ 24. Santos-Means was offered a Correctional Officer interlock position and a civilian position, but she turned down both options. [77] ¶¶ 43–46.[3] Santos-Means contends that sergeant-level positions were available and not offered to her. The evidence she points to shows transfers and promotions of various Sheriff's Office employees, which may have opened up sergeant-level positions in other areas. But all of these possible openings occurred in the weeks and months after she was offered the Correctional Officer and civilian positions, and she does not show what specific positions were clearly available or whether she could perform the essential functions of those positions with her restrictions. *See* [89] ¶¶ 25–27.

A year later, in August 2012, Santos-Means again reported to the medical unit with the same work restrictions, except that instead of avoiding contact with inmates with airborne diseases, the restriction asked that she be permitted to wear a protective mask in case of contact with inmates with tuberculosis or other airborne diseases. [77] ¶ 47. Her union sent the personnel director a letter on Santos-Means's behalf, requesting that she be permitted to return to work as a Correctional Sergeant and that she be assigned a position that would accommodate

---

[3] Santos-Means disputes these statements of fact because before she met with the personnel director, she initially met with the deputy director and was asked to provide more information to the medical unit. Those facts, however, do not controvert her admission that she was offered these positions and turned them down. [72-2] at 77–78.

her restrictions. The letter specifically stated that the air quality at the jail and Boot Camp would exacerbate her condition and requested that she be assigned to other areas of the Sheriff's Office such as "Pre-Release or the Office of Policy and Audits or other administrative operational divisions of the Department." [77] ¶ 48; [72-22]. The personnel director identified a Correctional Sergeant position at the Cook County Jail Pre-Release Center and notified Santos-Means, who accepted the position. [77] ¶ 49. Santos-Means worked at the Pre-Release Center for three days before she went to the hospital and was diagnosed with pneumonia. [77] ¶ 50; [89] ¶ 11. She did not return to work and did not submit for FMLA or ordinary disability leave. [77] ¶ 52. Santos-Means says that the conditions at the Pre-Release Center caused her to contract pneumonia and exacerbated her conditions of sarcoidosis and asthma. [77] ¶ 56; [89] ¶ 11. According to Santos-Means, the Pre-Release Center contained asbestos, visible mold, and water damage in the ceilings. [89] ¶¶ 11, 33. At the time of Santos-Means's assignment, the personnel director was not aware of any existing environmental conditions at the Pre-Release Center; when deposed, the personnel director agreed that a facility with mold and asbestos would not be an appropriate environment for someone with a respiratory condition. [89] ¶¶ 28–29.[4]

---

[4] After the parties briefed the Sheriff's Office's motion for summary judgment, Santos-Means moved for leave to file (or for the court to take judicial notice of) a 2008 Department of Justice Report regarding conditions at the Cook County Jail. [91]. Only the first page of the 98-page report was included as an exhibit to plaintiff's statement of additional facts and marked at the deposition of the Sheriff's Office personnel director. *See* [78] at 169–177, 194–95; [76-27]. The Sheriff's Office opposes the motion but does not argue prejudice or that it was unaware of the report's contents, and therefore Santos-Means is granted leave to file the report. But it has limited relevance to Santos-Means's claims, and judicial notice is not appropriate. Santos-Means only loosely refers to the report in two fact statements. [89] ¶¶

7

Santos-Means eventually returned to work in 2013 after she was cleared by her doctor. She discussed her return to work with the personnel director, and it was determined that her then-restrictions could be accommodated by working at the Sheriff's Office Visitation Center. [77] ¶ 53. None of Santos-Means's claims in this lawsuit relate to her assignment at the Visitation Center or any assignments thereafter.

## III. Analysis

### A. Discrimination

An employee may state a claim for discrimination under the ADA based on the employer's failure to accommodate her disability. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015); 42 U.S.C. § 12112(b)(5)(A). To establish a violation of the ADA, the employee must prove "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Winsley v. Cook Cty.*, 563 F.3d 598, 603 (7th Cir. 2009). In employment discrimination cases, courts must not separate "direct" from "indirect"

---

30–31. Although the personnel director knew the report existed and was questioned about it at her deposition, she was not shown the report—instead counsel read portions of it to her—and she was unaware of its findings on environmental conditions at the Cook County Jail. [78] at 169–77. Santos-Means worked at the jail's Pre-Release Center four years after the report was issued, and she does not identify any findings in the report particular to the Pre-Release Center (rather than the jail, generally, and inmate housing). Judicial notice must be used with caution, *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997), and Santos-Means has not established that the report indisputably reflects the conditions at the Pre-Release Center in 2012. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995).

evidence but instead must evaluate the evidence as a whole. *Ortiz v. Werner Enters., Inc.*, No. 15-2574, 2016 WL 4411434, at *4–5 (7th Cir. Aug. 19, 2016).

Santos-Means claims that the Sheriff's Office failed to accommodate her disability by failing to ensure that employees did not smoke near the Boot Camp entryway in 2010, by denying her request in the fall of 2011 to take the Boot Camp fitness test indoors, by failing to offer her a sergeant-level position when she returned to work in August 2011, and by placing her at the Pre-Release Center when she returned to work in August 2012. The Sheriff's Office does not contest that Santos-Means is disabled but argues that she was not a "qualified individual" able to perform the essential functions of her job. It also argues that it provided reasonable accommodations to Santos-Means.

### 1. *Entryway Smoking*

Santos-Means contends that the Sheriff's Office did not address her complaints about other Boot Camp employees smoking near the entryway. The Sheriff's Office argues that even if this were a request for an accommodation, this theory fails as a matter of law because she received a reasonable accommodation and was not subject to an adverse employment action.

On the undisputed record, no jury could find that the Sheriff's Office's efforts to accommodate Santos-Means were unreasonable. "The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort." *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995). When Santos-Means complained about the smoking to the captains and the director of the Boot Camp, announcements

9

were made at roll call to instruct employees that smoking was not allowed near the entryway. Within a few weeks of being notified of her complaints, the director had lines drawn around outside of the entranceway to indicate restricted areas for smoking, posted laminated no smoking signs, and issued a memorandum to all staff designating the restricted area where smoking was permitted, which was read at five consecutive roll calls. [77] ¶¶ 16–21. Although Santos-Means contends that these accommodations were not sufficient because some employees still smoked near the entryway, she admitted that these employees would move away from the entryway when they saw her coming and that by the time she got to the building, no one would be there. [77] ¶ 22; [81] at 131–33. Moreover, Santos-Means testified that beyond her initial complaints, she did not have another conversation with the director or the captains about the issue, and that she could have initiated disciplinary action against drill instructors who she saw smoking near the entryway but chose not to do so. [77] ¶ 18; [81] at 119–25. Santos-Means's assertion that the Sheriff's Office could have more strictly enforced the smoking ban does not show that its efforts were unreasonable, particularly when she did not inform those in charge that she thought the accommodation was not working out. *See, e.g., Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) (where the employer provided a reasonable accommodation, the plaintiff's "apparent displeasure with the way in which [the employer] decided on that accommodation, or with its failure to provide the exact accommodation he would have preferred, [was] irrelevant"); *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1179 (7th Cir. 2013) (affirming summary

judgment where the employer "had no way of knowing that its other seemingly reasonable accommodations . . . would be insufficient"), *overruled on other grounds by Ortiz*, 2016 WL 4411434, at *4.

The Sheriff's Office provided reasonable accommodations to address Santos-Means's complaints about employees smoking by the Boot Camp entryway, and therefore it is entitled to summary judgment on this issue.

### 2. *Indoor Fitness Test*

Santos-Means does not respond to the Sheriff's Office's argument that her 2010 request to take the fitness test indoors was never denied and was essentially rendered moot when she went on leave shortly thereafter. She also does not identify this request in her brief as one of the Sheriff's Office's failures to accommodate her. [76] at 7–11. Her only response is in her statement of additional facts, which asserts that she requested the accommodation. [89] ¶ 18. Her failure to develop a responsive argument effectively waives this issue. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Considering the issue on its merits, the Sheriff's Office would still be entitled to summary judgment. The undisputed record shows that the Sheriff's Office requested confirmation of her medical restrictions, but Santos-Means left on medical and disability leave before she could comply. [77] ¶¶ 26–31. Santos-Means admits that the Sheriff's Office did not deny her request. [77] ¶ 29. Any breakdown in the interactive process for this particular request must be attributed to Santos-Means's departure, which prevented her from providing the Sheriff's Office with further information and which rendered her request moot at that point in time. *See,*

11

*e.g., Jackson v. City of Chicago*, 414 F.3d 806, 813–14 (7th Cir. 2005) (plaintiff caused breakdown in interactive process when she failed to respond to the employer's specific requests for information on the extent of her limitations); *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 806 (7th Cir. 2005) ("Our cases illustrate that when an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information."). The Sheriff's Office is entitled to summary judgment on this issue.

### 3. *Sergeant Position*

When Santos-Means sought to return to work in August 2011, the Sheriff's Office did not offer her a sergeant-level position (at the Boot Camp or otherwise), and on this basis, she argues that she was denied a reasonable accommodation. The Sheriff's Office contends that Santos-Means cannot show that she was a "qualified" individual capable of performing the "essential functions" of Drill Sergeant, based on her restrictions at the time, and that she was offered other positions satisfying her restrictions but turned them down.

A plaintiff claiming failure of reasonable accommodation must show that she is a "qualified individual with a disability," meaning that she is disabled under the ADA and can perform the essential functions of the job, with or without reasonable accommodation. *Curtis*, 807 F.3d at 224. If a plaintiff is not a qualified individual, her failure to accommodate claim fails. *Id*. Santos-Means bears the initial burden of establishing that she was a "qualified individual who could perform the essential functions of her position." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d

12

478, 493 (7th Cir. 2014); *see* 42 U.S.C. § 12111(8). Once she has shown that she is a qualified individual with a disability, she then must show that her employer was aware of her disability but failed to afford her a reasonable accommodation. *Taylor-Novotny*, 772 F.3d at 493. Here, Santos-Means was not a "qualified individual" for the purposes of the ADA because she could not perform essential functions of the position of Drill Sergeant at the Boot Camp.

An employer is entitled to define the essential functions of the position. *See* 42 U.S.C. § 12111(8); *Webb v. Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991, 999 (7th Cir. 2000). It is undisputed that Boot Camp Drill Sergeants supervise the daily activities of Drill Instructors, exercise and march with inmates and Drill Instructors, assist in emergency situations, and assume Drill Instructor duties in case of a staff shortage. [77] ¶ 9. Interaction with inmates, then, is an essential function of a Boot Camp Drill Sergeant, but when Santos-Means sought to return to work in 2011, she was specifically restricted from contact with inmates with tuberculosis or other airborne diseases at the risk of "hospitalization and/or death." [77] ¶¶ 32–34. Santos-Means argues that her restriction was not incompatible with a position requiring inmate contact because inmates known to have airborne diseases are removed from the general inmate population. [77] ¶ 41. (She also argues that she was not restricted from contact with diseased inmates because her doctor's restrictions in 2012 said that she could merely work with a protective mask when around inmates with airborne diseases, but that is not relevant to her restrictions in 2011.). But she offers no response to the difficulty—essentially, the

13

impossibility—of working as a Drill Sergeant while avoiding contact with inmates with *undetected* airborne diseases. *See Webb*, 230 F.3d at 1000.

While Santos-Means was not explicitly restricted from all inmate contact, such a restriction was implicit because inmates with undetected airborne diseases would not have been removed from the general inmate population. Accommodating the restriction would, as in *Webb*, "place [the employer] on the 'razor's edge' of being sued under the ADA for denying [plaintiff's] request or eventually being sued for negligence if [plaintiff's] health is put in jeopardy by a[n] . . . infectious [inmate]." 230 F.3d at 1000; *see, e.g., Newell v. Alden Vill. Health Facility for Children & Young Adults*, No. 15-1245, 2016 WL 3092121, at *3 (7th Cir. June 2, 2016) (nurse's proposed accommodation of working only with high-functioning, nonaggressive residents was not reasonable and would still violate her doctor's restriction on interaction or contact with residents). Because Santos-Means's restrictions prevented her from inmate contact, an essential function of the Drill Sergeant position, she cannot show that she was a qualified individual entitled to an accommodation. For this reason, her arguments over whether the fitness test was also an essential function of the position—and whether she was denied an exemption from the fitness test—do not preclude summary judgment for the Sheriff's Office.

Supposing Santos-Means could show that she was a qualified individual, she is unable to show that the accommodations provided by the Sheriff's Office were unreasonable. When she was denied the opportunity to return as a Boot Camp Drill

Sergeant, Santos-Means was offered ADA-designated Correctional Officer positions that had no direct contact with detainees and limited contact with other employees. [77] ¶ 42. She was also offered a civilian position, but she turned down both options. [77] ¶¶ 43–46. Santos-Means does not argue that these positions would not have accommodated her restrictions. Instead she argues that it was unreasonable for the Sheriff's Office to only offer positions at a reduced rank or as a civilian. But under the ADA, "the employer is obligated to identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites and consider transferring the employee to any of those other jobs, including those that would represent a demotion." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000) (marks omitted); *see Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 291 (7th Cir. 2015) ("[T]he ADA requires an employer to consider reassigning a disabled employee to a job that would represent a demotion."). And ultimately, "[i]t is the employer's prerogative to choose a reasonable accommodation." *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). An employer is "not obligated to provide an employee the accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 681 (7th Cir. 2010). Santos-Means was not entitled to the accommodation of her choice, only a reasonable accommodation. While Santos-Means also argues that there were other sergeant-level positions available that she should have been offered, she does not cite evidence showing that these

15

were available at that time or that she could meet the essential functions of those positions with her restrictions.

The ADA requires an employer to "mak[e] reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). The proposed accommodations here satisfied that requirement—Santos-Means does not argue otherwise. "[B]y rejecting the proposed [reasonable] accommodations, she was responsible for terminating the interactive process and hence not entitled to relief under the ADA." *Gratzl*, 601 F.3d at 682. The Sheriff's Office is entitled to summary judgment on this issue.

### 4. *Pre-Release Center*

In August 2012, Santos-Means sought to return to work with essentially the same work restrictions as before, except that instead of avoiding contact with inmates with airborne diseases, she asked to wear a protective mask in case of contact with inmates with tuberculosis or other airborne diseases. [77] ¶ 47. Her union sent the Sheriff's Office a letter on her behalf, requesting that she be permitted to return to work as a Correctional Sergeant and be assigned a position that would accommodate her restrictions. The letter specifically stated that the air quality at the jail and Boot Camp would exacerbate her condition and requested that she be assigned to "such operational areas of the Cook County Department of Corrections as Pre-Release or the Office of Policy and Audits or other administrative operational divisions of the Department." [77] ¶ 48; [72-22]. The personnel director identified an available Correctional Sergeant position at the Pre-Release Center and notified Santos-Means, who accepted the position. [77] ¶ 49. Santos-Means

16

worked at the Pre-Release Center for three days before she went to the hospital and was diagnosed with pneumonia. [77] ¶ 50. She contends that the conditions at the Pre-Release Center were unsuitable for her respiratory disease and caused her pneumonia. [77] ¶ 50; [89] ¶ 9.

Although she (through her union) suggested the Pre-Release Center position and accepted it after meeting with the personnel director, Santos-Means now contends that it was an unreasonable accommodation and that the Sheriff's Office should have offered her one of the other positions requested in the letter (i.e., the Office of Policy and Audits or another administrative operational division). But the question is not whether the Sheriff's Office could have chosen another reasonable accommodation, but rather whether the Sheriff's Office's chosen accommodation was reasonable, in light of all of the facts. *See Cloe*, 712 F.3d at 1179.

In retrospect, the position at the Pre-Release Center may not have been a suitable fit for Santos-Means's restrictions. But that does not mean that the Sheriff's Office's efforts to accommodate her were unreasonable, especially given that Santos-Means specifically requested the position and accepted it as an appropriate accommodation at the time during the interactive process with the Sheriff's Office. The undisputed evidence demonstrates that, at the time of the accommodation, both sides believed it to be suitable and reasonable. *See Cloe*, 712 F.3d at 1178–79 (accommodations that were unsuitable only in hindsight were not unreasonable); *see also Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996) (affirming summary judgment for employer where it was apparent from

17

the record that the employer "thought at the time that it was doing the right thing" based on its understanding of her disability).

The purpose of the interactive process is to bring "the employee and employer together in cooperation to 'identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working.'" *Cloe*, 712 F.3d at 1178 (quoting in part *Gile*, 213 F.3d at 373); *see Sears, Roebuck & Co.*, 417 F.3d at 805. "[W]here, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow." *Beck*, 75 F.3d at 1137. The Sheriff's Office granted Santos-Means a specific accommodation that she requested. Although in hindsight it may not have been a suitable accommodation given her restrictions, there is no evidence in the record of the Sheriff's Office failing to participate in good faith or failing to make reasonable efforts to determine a suitable accommodation upon her return to work in August 2012. There is no evidence that the Sheriff's Office acceded to Santos-Means's request knowing it would be unsuitable. The Sheriff's Office is entitled to summary judgment on this claim.

**B.     Retaliation**

To state a claim for retaliation under the ADA, Plaintiff must show that (1) she engaged in a statutorily protected activity, (2) the retaliator was aware of the protected activity, (3) she suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse action. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). The Sheriff's Office argues that

Santos-Means's retaliation claim merely restates her ADA discrimination claim because the only adverse employment action that she identifies is the failure to provide her with her requested accommodations (or, in the case of the Pre-Release Center, a different accommodation). Santos-Means responds that the Sheriff's Office retaliated against her for requesting ADA accommodations, and that her tangible injuries were the Sheriff's Office's offer of only reduced-rank positions in 2011 and the assignment to the Pre-Release Center in 2012. But these actions consist of the same alleged failures to accommodate comprising her ADA discrimination claim, and therefore she cannot state a separate claim for retaliation. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (plaintiff's contention that employer took adverse action against him by failing to reasonably accommodate him "merely reclothes" plaintiff's ADA discrimination claim). A retaliation claim based entirely on a failure to accommodate is redundant in a manner not likely intended by Congress. *See Moore-Fotso v. Bd. of Educ. of the City of Chicago*, No. 12-CV-10419, 2016 WL 5476235, at *18 (N.D. Ill. Sept. 29, 2016) (collecting cases). Moreover, in this case the Sheriff's Office did not act unreasonably in attempting to accommodate Santos-Means's disability, and so did not take an adverse employment action against her in response to her requests.

## IV. Conclusion

Santos-Means's motion for leave to file exhibit 28-2, [91], is granted in part, and the Sheriff's Office's motion for summary judgment, [71], is granted. Enter judgment and terminate civil case.

ENTER:

/s/ Manish S. Shah

Manish S. Shah
United States District Judge

Date: 10/19/2016